185 Cal.App.4th 1313 (2010)
ANA SILVA YANEZ, Plaintiff and Appellant,
v.
SOMA ENVIRONMENTAL ENGINEERING, INC., et al., Defendants and Respondents.
No. A123893.
Court of Appeals of California, First District, Division One.
June 24, 2010.
*1315 Law Office of Paul B. Kemp, Paul B. Kemp and Dan C. Schaar for Plaintiff and Appellant.
Hinton, Alfert & Sumner, Scott H.Z. Sumner and Jeremy Lateiner for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.
Horvitz & Levy, H. Thomas Watson, David S. Ettinger; Toschi, Sidran, Collins & Doyle, Steve Toschi and Sumair S. Sandhu for Defendants and Respondents.

*1316 OPINION
MARGULIES, Acting P.J.
Plaintiff Ana Silva Yanez sued defendants SOMA Environmental Engineering, Inc., Mansour Sepehr, and Brian Tims (collectively SOMA) for injuries she suffered in an automobile accident. A jury found that SOMA's negligence caused Yanez's injuries, and returned a special verdict awarding her $150,000 in damages, including $44,519.01 in damages for past medical expenses. After judgment was entered, SOMA moved to reduce the award for medical expenses to $18,368.24, which was the amount actually accepted by Yanez's medical providers as payment in full under their contracts with Aetna and Healthnet, her private health insurers. The trial court granted the motion and entered an amended judgment reducing Yanez's damages award.
Yanez appeals from the amended judgment, contending the trial court erred in reducing the jury's award, and in denying Yanez her postoffer costs and interest under Code of Civil Procedure section 998. We reverse the amended judgment and remand the case back to the trial court to (1) enter a new judgment restoring the original amount of damages awarded by the jury, and (2) redetermine Yanez's entitlement to an award of costs and prejudgment interest.

I. BACKGROUND
Yanez sued SOMA for injuries suffered in an October 2005 automobile accident. The individual defendants were the driver of the pickup truck that collided with Yanez's automobile and the owner of SOMA Environmental Engineering, Inc.
Over SOMA's objections, the trial court granted Yanez's motion to allow into evidence the amounts billed by her health care providers for her medical treatment, without regard to the amount of the billed expenses that were actually paid (by Yanez or her health insurers) or were still considered owing by the provider. SOMA contended unpaid amounts were irrelevant to its liability but conceded the trial court had no choice but to grant the motion in light of Greer v. Buzgheia (2006) 141 Cal.App.4th 1150 [46 Cal.Rptr.3d 780] (Greer).[1]
Over Yanez's objection, the court ruled it would conduct a posttrial hearing to determine if her medical expense damages should be reduced to the *1317 amount of the expenses actually paid to her providers by Yanez or her insurance carriers, and accepted by the providers as payment in full for their services.
The trial was limited to the issues of causation and damages. During the trial, Yanez submitted documentary evidence of her past medical bills to the jury and her surgeon testified that the surgery bill for approximately $17,000 was reasonable. Regarding past medical expenses, the jury was instructed to award damages in an amount that would compensate Yanez for "the reasonable cost of reasonably necessary medical care that she has received." The jury returned a special verdict of $150,000, which included an award of $44,519.01 in damages for past medical expenses for services from 10 different health care providers. The court entered judgment on the verdict for $150,000.
SOMA moved to reduce Yanez's medical expenses to $18,368.24, the amount actually accepted by her medical providers as payment in full for the services she received. The motion included evidence of medical billings and actual payments, and stated further evidence would be presented through affidavits or live testimony at the posttrial hearing the court had agreed to hold. At the hearing, SOMA's witnesses, representing several of Yanez's providers, furnished business records of billings and payments, and testified that each of the providers had written off a substantial amount of what had been billed, pursuant to their contracts with Yanez's health insurers, Aetna and Healthnet, and that she did not owe the amounts written off. None of the provider-insurer contracts in question were introduced in evidence. Although the witnesses testified that set amounts or percentages were discounted, they did not testify about how the providers and insurers negotiated or arrived at the amount of the discounts. Yanez's counsel objected to admission of the business records on the grounds their admission violated the collateral source rule and the records were irrelevant. Yanez's objection was overruled and the court reduced her medical expense damages by a total of $21,355.66, for five different health care providers. The court entered an amended judgment reducing Yanez's damages award accordingly. The judgment also awarded her all of her recoverable court costs.
Before trial, Yanez had made an offer to settle for $150,000 under Code of Civil Procedure section 998 (hereafter section 998 offer). SOMA did not accept the offer. In her posttrial memorandum of costs, Yanez claimed entitlement to prejudgment interest of $17,133.67 and to $6,992.50 in expert witness fees because, including ordinary trial costs, she recovered more than her settlement offer. (Code Civ. Proc., § 998, subd. (d); Civ. Code, § 3291.) SOMA moved to tax the prejudgment interest and expert witness fees on the ground that if the medical expense award were reduced, the judgment would *1318 be less than Yanez's section 998 offer.[2] After granting SOMA's motion to reduce Yanez's medical expense damages, the trial court held that she did not obtain a judgment exceeding her settlement offer. The court accordingly struck the prejudgment interest cost claim in its entirety and struck $5,992.50 of the expert witness fees claimed by Yanez.
Yanez timely appealed from the amended judgment.

II. DISCUSSION
Yanez contends the trial court erred in (1) reducing the jury's award of past medical specials to the amounts actually paid by her and her insurers to her medical providers, and (2) finding it had no discretion to award Yanez her postoffer costs and interest under Code of Civil Procedure section 998 due to the reduced amount of her medical specials.

A. Medical Expense Damages Award

Yanez argues the trial court violated the collateral source rule by limiting her recoverable damages to the amounts she and her insurers actually paid for her accident-related medical care. According to Yanez, the portions of the medical bills written off by the providers, totaling $21,355.66, were in fact collateral source benefits that under California's collateral source rule could not be deducted from her recoverable damages. We begin by reviewing the applicable authorities defining the collateral source rule.

1. The Collateral Source Rule

(1) The collateral source rule provides that the compensatory damages recoverable from a tortfeasor in a personal injury case should not be reduced merely because the tort victim also receives compensatory benefits from independent or collateral sources, such as insurance. The rule has been described as follows: "`[T]he courts generally have held that benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable from the wrongdoer. . . . [T]he wrongdoer cannot take advantage of the contracts or other relation that may exist between the injured person and third persons. Thus, while a plaintiff's recovery under the ordinary negligence rule is limited to damages which will make him whole, the collateral source rule allows a plaintiff further recovery under certain circumstances even though he *1319 has suffered no loss.' [¶] 22 Am.Jur.2d Damages § 566 (1988) (citations omitted)." (Marsh v. Green (Ala. 2000) 782 So.2d 223, 230.)
(2) California has adopted the collateral source rule. (Lund v. San Joaquin Valley Railroad (2003) 31 Cal.4th 1, 9 [1 Cal.Rptr.3d 412, 71 P.3d 770].) The rationale for it was explained in Helfend v. Southern Cal. Rapid Transit Dist. (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 61] (Helfend). The plaintiff in Helfend was injured when a transit district bus driver sideswiped his car. (Id. at pp. 4-5.) The plaintiff sued the bus driver and his public employer. (Id. at p. 5.) At trial, the defendants asked to show that about 80 percent of the plaintiff's hospital bill had been paid by the plaintiff's Blue Cross insurance carrier and that some other medical expenses had been paid by other insurance. (Ibid.) The trial court denied the request, and the jury awarded the plaintiff $16,400. (Ibid.) The defendant appealed, claiming the collateral source rule did not apply to tort actions involving public entities. (Id. at p. 14.)
Helfend explained the rationale for the collateral source rule as follows: "Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (Helfend, supra, 2 Cal.3d at p. 10.) The Helfend court rejected arguments that the rule provides plaintiffs with a double recovery, pointing out plaintiffs rarely receive full compensation for injuries due to the significant portion of the recovery that goes to compensate the plaintiff's attorney under standard contingent fee agreements. (Id. at p. 12.) According to Helfend, the collateral source rule "partially serves to compensate for the attorney's share and does not actually render a `double recovery' for the plaintiff." (Ibid.) The court further noted the tort victim obtains no double recovery to the extent insurers can recover their outlays from the tort victim via contractual subrogation rights. (Id. at pp. 10-11.)
Nonetheless, the courts apply the collateral source rule even when it unquestionably does confer a windfall benefit on the tort plaintiff. The rule reflects a policy preference favoring the tort victim over the wrongdoer since not applying the rule allows the wrongdoer to profit from the victim's investment in purchasing insurance or from the generosity of those who come to the victim's aid. (See Smock v. State of California (2006) 138 Cal.App.4th 883, 888 [41 Cal.Rptr.3d 857].)
*1320 (3) California also applies a closely related evidentiary principle that, absent special circumstances, the jury should not hear evidence concerning collateral source benefits received by the plaintiff: "The potentially prejudicial impact of evidence that a personal injury plaintiff received collateral insurance payments varies little from case to case. Even with cautionary instructions, there is substantial danger that the jurors will take the evidence into account in assessing the damages to be awarded to an injured plaintiff. Thus, introduction of the evidence . . . creates the danger of circumventing the salutary policies underlying the collateral source rule. Admission . . . should be permitted only upon a persuasive showing that the evidence sought to be introduced is of substantial probative value." (Hrnjak v. Graymar, Inc. (1971) 4 Cal.3d 725, 732-733 [94 Cal.Rptr. 623, 484 P.2d 599], fn. omitted (Hrnjak).)
The Legislature has limited the application of the collateral source rule in certain contexts. Judgments against public entities may be reduced under Government Code section 985, based on services or benefits the plaintiff has received from certain publicly funded sources and private insurance. Civil Code section 3333.1 partially exempts malpractice actions against health care providers from the collateral source rule.

2. California Case Law Concerning Discounted Costs

There is no dispute in this case that the collateral source rule applied to and entitled Yanez to recover the actual amounts paid by her and her insurers to her health care providers for injuries caused by SOMA's negligence. There was also no dispute that the fact Yanez had insurance coverage for part of the medical costs she incurred as a result of the accident was inadmissible under Hrnjak. The primary question raised by this appeal is whether the collateral source rule entitled Yanez to recover the full amount billed by her providers for her medical care, $44,519.01, or only the discounted amount actually paid out of pocket by her and her insurers, and accepted by her medical providers as payment in full, $18,368.24.
In Hanif v. Housing Authority (1988) 200 Cal.App.3d 635 [246 Cal.Rptr. 192] (Hanif), a Third Appellate District panel held that a plaintiff struck by an automobile, who had no private medical insurance, could not recover amounts for medical services in excess of those paid on his behalf by Medi-Cal. (Id. at p. 640.) The plaintiff had sought to introduce evidence that *1321 the reasonable value of the medical services he received exceeded the amounts Medi-Cal had actually paid to his providers. (Id. at p. 639.) Based on the collateral source rule, Hanif held initially that Medi-Cal's payments did not preclude the plaintiff from recovering as special damages the amount Medi-Cal paid for those services. (Id. at pp. 639-640.) The court stated it was "not unreasonable or unfair in light of Medi-Cal's subrogation and judgment lien rights" for the plaintiff to be deemed to have personally paid or incurred liability for those amounts for purposes of assessing special damages. (Id. at p. 640.) But, based on its separate analysis of the proper measure of medical expense damages, Hanif went further. The court held that the plaintiff was not entitled to recover any more than the actual amount paid for past medical care and services or for which a liability was incurred. (Ibid.) As will be discussed in further detail post, the court reasoned that any compensation in excess of the amount actually paid or incurred, plus any discounts furnished as gifts to the plaintiff, would place the plaintiff in a better position than he would have been in had the tort not been committed. (Id. at pp. 640-644.)
Decided by another panel of this court, Nishihama v. City and County of San Francisco (2001) 93 Cal.App.4th 298 [112 Cal.Rptr.2d 861] (Nishihama), involved a plaintiff with an employer-sponsored Blue Cross medical plan under which her provider agreed to accept reduced rates as payment in full for its services. (Id. at p. 306.) The defendant conceded its liability to pay the plaintiff the amounts actually paid by Blue Cross to the provider, but objected to the jury's award of medical damages based on the provider's higher, normal rates. (Id. at p. 307.) The plaintiff insisted she was entitled to a recovery based on the provider's normal charges because the provider had filed a lien against her judgment seeking to recover the difference between the Blue Cross payments it received and its normal rates, pursuant to the Hospital Lien Act (HLA) (Civ. Code, § 3045.1 et seq.). (Nishihama, at p. 307.) Nishihama reasoned that the damages awarded should have been limited to the reduced charges Blue Cross actually paid rather than the provider's normal charges because the provider's lien rights under the HLA derived from, and could be no greater than, the plaintiff's rights against the tortfeasor. (Nishihama, at pp. 307-309.) As to the latter, Nishihama simply followed Hanif in holding that the plaintiff could recover no more from the tortfeasor than the amount actually paid or incurred for medical services, whether by the plaintiff herself or by an independent source such as insurance. (Nishihama, at p. 306.) Nishihama did not address whether Hanif should apply outside of the Medi-Cal context, but assumed without discussion that discounted provider reimbursement rates negotiated by private insurance companies were indistinguishable from reduced rates established by *1322 publicly funded medical insurance programs like Medi-Cal for purposes of establishing economic damages under the collateral source rule.[3]
In Greer, the appellate court implicitly accepted Nishihama's premise that "it is error for the plaintiff [in a tort action] to recover medical expenses in excess of the amount paid or incurred." (Greer, supra, 141 Cal.App.4th at p. 1157, italics omitted.) The court nonetheless upheld a judgment awarding the plaintiff tort victim the full amount of the medical expenses billed by his providers because the defendant had failed to preserve his claim for a "Hanif/Nishihama reduction" by not requesting a sufficiently specific special verdict form. (Greer, at pp. 1154, 1157-1159.)
In Olsen v. Reid (2008) 164 Cal.App.4th 200 [79 Cal.Rptr.3d 255] (Olsen), the plaintiff and amicus curiae asked the appellate court to reconsider the holdings in Hanif and Nishihama that when a plaintiff has medical insurance, tort damages must be limited to the amount actually paid or incurred. (Olsen, at p. 203.) The court declined to reach that question, however, because it was not clear from the evidence that the plaintiff's medical providers had in fact discounted or written off part of their medical expense charges. (Id. at pp. 202-203.) Two of the justices, in separate concurring opinions, did reach the issue. Justice Moore argued that, as applied to situations involving private insurance, the Hanif/Nishihama line of cases abrogated the collateral source rule. (Olsen, at p. 213 (conc. opn. of Moore, J.).) She reasoned that under Hanif/Nishihama, an uninsured tort victim would receive a greater recovery from the tortfeasor than a victim with private insurance, a result she viewed as drastically undermining a key policy rationale behind the collateral source rule. (Olsen, at p. 215.) Justice Moore contended a change of this sort to the collateral source rule could only be adopted by legislative action or by endorsement from the California Supreme Court. (Id. at pp. 213-214.) Justice Moore also observed confusion had arisen about the procedures to be followed in reducing a damages award under the Hanif/Nishihama line of casesover the type of hearing to be held, the burden of proving the amounts actually paid, and the standard of review on appealwhich she attributed to trying to apply "judge-made rules of this kind." (Olsen, at p. 213, fn. 3.)
Justice Fybel, in his concurring opinion, endorsed the Hanif/Nishihama analysis, which he characterized as "limiting recovery . . . to the amount of actual damages incurred . . . ." (Olsen, supra, 164 Cal.App.4th at p. 216 (conc. opn. of Fybel, J.).) He found the principles underlying these cases to *1323 be firmly grounded in several California statutesCivil Code sections 3281,[4] 3282,[5] 3333,[6] 1431.2, subdivision (b)(1)[7]as well as the Restatement Second of Torts (Restatement), section 911, comment h, pages 476-477.[8] Justice Fybel contended that Hanif and Nishihama followed the collateral source rule "because the plaintiffs in those cases recovered all medical costs actually incurred, even though the costs were paid by others." (Olsen, at p. 215.)
SOMA also calls our attention to a recent criminal casePeople v. Millard (2009) 175 Cal.App.4th 7 [95 Cal.Rptr.3d 751]. The defendant in Millard was convicted of driving under the influence causing bodily injury to another person, and was ordered to pay restitution for the victim's medical expenses. (Id. at p. 13.) The People appealed the trial court's restitution order, arguing in part that the trial court erred by valuing the victim's medical expenses based on the amount paid by his insurance company rather than the amount billed by his medical providers. (Ibid.) The appellate court upheld the trial court's methodology, following People v. Bergin (2008) 167 Cal.App.4th 1166 [84 Cal.Rptr.3d 700], a previous restitution case that had relied on Hanif. Applying an abuse of discretion standard of review to the trial court's restitution order, the Millard court found that limiting restitution to the amount actually paid by the insurer had a rational basis and was not based on a demonstrable error of law. (Millard, at pp. 26, 28-29.) The court observed that a restitution order was not intended to provide the crime victim with a windfall, but only to reimburse the victim for the actual economic loss incurred, even if the amount of the loss is paid by a collateral source such as Medi-Cal or private insurance. (Id. at p. 28.) Because Millard's consideration of the issue was limited to whether there was a rational basis for the trial court's restitution order, we do not find it persuasive in the present context.
*1324 The issue of whether amounts written off by a health care provider pursuant to its contract with a private insurer may be recovered as damages under the collateral source rule is now before the California Supreme Court.[9]

3. Out-of-state Cases

The great majority of decisions from other jurisdictions have concluded that the collateral source rule entitles tort victims to recover the full amount of reasonable medical expenses charged, including amounts written off from their bills pursuant to contractual rate reductions or under Medicaid or Medicare. (See case law reviews in Robinson v. Bates (2006) 112 Ohio St.3d 17 [2006 Ohio 6362, 857 N.E.2d 1195, 1199]; Lopez v. Safeway Stores, Inc. (Ct.App. 2006) 212 Ariz. 198 [129 P.3d 487, 495] (Lopez); Scott v. Garfield (2009) 454 Mass. 790 [912 N.E.2d 1000, 1011-1012]; Stanley v. Walker (Ind. 2009) 906 N.E.2d 852, 864; Wills v. Foster (2009) 229 Ill.2d 393 [323 Ill.Dec. 26, 892 N.E.2d 1018, 1025-1029] (Wills).)[10],[11] A few of the states following the majority rule allow such recoveries when the plaintiff is covered by private insurance or Medicare, for which premiums are required to be paid, and limit recovery to the actual amount paid to providers when the plaintiff is covered by Medicaid for which no premium is required. (See Bozeman, supra, 879 So.2d at pp. 703-705; Rose, supra, 78 P.3d at p. 803; Wills, supra, 892 N.E.2d at pp. 1030-1031.)
*1325 The Virginia Supreme Court's reasoning in Acuar is representative of the majority view: "[Defendant] contends that the collateral source rule is not applicable . . . because [plaintiff] is not, and never will be, legally obligated to pay those portions of his medical bills that were written off, nor were those amounts paid on his behalf. According to [defendant], the amounts written off . . . are not benefits derived from a collateral source, and to allow [plaintiff] to recover such amounts . . . would create a double recovery or windfall in his favor. [¶] . . . [Plaintiff] maintains that, if [defendant's] position were adopted, she would derive a benefit from [plaintiff's] health insurance without having paid any consideration for [it], thereby creating a windfall for [defendant]. . . . [¶] . . . [¶] . . . [Defendant's] argument overlooks the fundamental purpose of the [collateral source] rule . . . to prevent a tortfeasor from deriving any benefit from compensation or indemnity that an injured party has received from a collateral source. . . . [T]he focal point of the collateral source rule is not whether an injured party has `incurred' certain medical expenses. Rather, it is whether a tort victim has received benefits from a collateral source that cannot be used to reduce the amount of damages owed by a tortfeasor. [¶] [Plaintiff] is entitled to seek full compensation from [defendant]. [Citation.] . . . [Defendant] cannot deduct from that full compensation any part of the benefits [plaintiff] received from his contractual arrangement with his health insurance carrier, whether those benefits took the form of medical expense payments or amounts written off because of agreements between his health insurance carrier and his health care providers. Those amounts written off are as much of a benefit for which [plaintiff] paid consideration as are the actual cash payments made by his health insurance carrier to the health care providers. [They] constitute `compensation or indemnity received by a tort victim from a source collateral to the tortfeasor . . . .'" (Acuar, supra, 531 S.E.2d at pp. 321-323.)
Moorhead exemplifies the minority view that amounts written off by the health care provider pursuant to contract or law may not be awarded as damages under the collateral source rule: "Awarding [plaintiff] the additional amount of $96,500.91 would provide her with a windfall and would violate fundamental tenets of just compensation. It is a basic principle of tort law that `damages are to be compensatory to the full extent of the injury sustained, but the award should be limited to compensation and compensation alone.' [Citation.] [Plaintiff] never has, and never will, incur the $96,500.91 sum from [defendant] as an expense. We discern no principled basis upon which to justify awarding that additional amount. [¶] . . . [¶] Additionally, we find that the collateral source rule is inapplicable to the additional amount of $96,500.91. The rule `provides that payments from a collateral source shall not diminish the damages otherwise recoverable from the wrongdoer. [Citation omitted]. The principle behind the collateral source rule is that it is better for the wronged plaintiff to receive a potential windfall [than] for a tortfeasor *1326 to be relieved of responsibility for the wrong.' [Citation.] [Plaintiff] relies upon comment b to the Restatement (Second) of Torts § 920A, which provides in pertinent part: `If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers.' . . . [¶] Clearly, [plaintiff] is entitled to recover $12,167.40, the amount which was paid on her behalf by Medicare and Blue Cross, the collateral sources. [Citation.] . . . [T]he issue is whether [plaintiff] is entitled to collect the additional amount of $96,500.91 as an expense. [Plaintiff] did not pay $96,500.91, nor did Medicare or Blue Cross pay that amount on her behalf. The collateral source rule does not apply to the illusory `charge' of $96,500.91 since that amount was not paid by any collateral source. [Citations.]" (Moorhead, supra, 765 A.2d at pp. 790-791.) Moorhead relied in part on Hanif. (Moorhead, at p. 790.)
Finally, a few states take no position as to whether the written off or full amount of the plaintiff's medical bills is a better measure of the reasonable value of the services rendered, but allow evidence of both to be presented to the jury. (See Stanley v. Walker, supra, 906 N.E.2d at p. 858; Robinson v. Bates, supra, 857 N.E.2d at pp. 1199-1200.) But courts taking the majority view have criticized this approach on the grounds it undermines the evidentiary component of the collateral source rule by letting jurors know (or inviting them to speculate) that the plaintiff's bills have been paid by a collateral source. (See Leitinger v. DBart, Inc. (2007) 2007 WI 84 [302 Wis.2d 110, 736 N.W.2d 1, 13-14].)

4. Analysis

In our view, the trial court erred in reducing Yanez's damages to the amounts actually paid by her insurers. Although the court reasonably relied on case law extending Hanif to the private insurance context, we find Hanif used overly broad language and the extension of its holding to private insurance by Nishihama and other cases is inconsistent with the collateral source rule. Consistent with the view taken by the appellate courts in a great majority of the jurisdictions that have considered the issue, we conclude the amounts written off by Yanez's health care providers constitute collateral benefits of her insurance. Whether the full amounts billed by Yanez's health care providers reflected the reasonable value of their services is a separate issue that was for the jury, not the court, to decide. Accordingly, we will reverse the judgment and remand the case to the trial court to enter a judgment consistent with the jury's award of damages and to reconsider its award of costs accordingly.
*1327 As an initial matter, we agree with Justice Moore's concurrence in Olsen that the Hanif/Nishihama line of cases is difficult to square with the collateral source rule, at least as applied to private insurance cases. (Olsen, supra, 164 Cal.App.4th at p. 213 (conc. opn. of Moore, J.).) The problem stems from Hanif's analysis of the measure of tort damages for medical expenses. Hanif correctly states the traditional rule that a tort victim is entitled to recover "the reasonable value of medical care and services reasonably required and attributable to the tort." (Hanif, supra, 200 Cal.App.3d at p. 640, italics added.) Focusing on a series of older cases applying this rule, Hanif observes that in each case the issue was whether the medical expenses actually paid or incurred were unreasonably high. (Id. at pp. 641-643.) Hanif generalizes from these cases as follows: "Implicit in the above cases is the notion that a plaintiff is entitled to recover up to, and no more than, the actual amount expended or incurred for past medical services so long as that amount is reasonable." (Id. at p. 643.) From this, Hanif concludes the term "reasonable value of medical care" must be construed as a "term of limitation" barring tort victims from receiving in damages any sum greater than the amount actually paid for their medical care or for which they or an independent source incurred liability for payment. (Id. at pp. 640, 641.) In deference to the collateral source rule, Hanif contemplated only one exception to this ruleif there was "evidence . . . the low rate charged was intended as a gift to the plaintiff." (Id. at p. 643.)
While Hanif impliedly recognized that a gift of services would have to be valued without regard to the amount incurred or paid, it failed to recognize other circumstances in which a below-value rate might be charged. In particular, Hanif did not address or appear to contemplate situations in which patients covered by private health insurance are charged reduced rates by the provider for their care as an insurance benefit negotiated between the insurer and the health care provider. We need not decide in this case whether Hanif was wrongly decided on its own facts. Those facts are materially different from ours: the plaintiff tort victim in Hanif had not purchased his Medi-Cal coverage by paying premiums and the rates Medi-Cal paid were not established or marketed as a benefit for him, but were set as a matter of legislative policy to balance the interests of providers with the availability of public funds. But, to the extent Hanif's holding has been assumed to extend beyond the Medi-Cal context, we do not find its analysis reliable. Because this court's decision in Nishihama relied on Hanif to reduce a plaintiff's jury award to the reduced rates paid by her private insurance, we must now reject that aspect of Nishihama's reasoning.
In addition to its analysis of the case law concerning the "reasonable value" measure of damages, Hanif (and Justice Fybel's concurrence in Olsen) also relied on various statutory provisions as well as language from comment h to section 911 of the Restatement in support of the proposition that a tort *1328 plaintiff can recover no more than the amounts paid or incurred for medical care. (Hanif, supra, 200 Cal.App.3d at pp. 640-641; Olsen, supra, 164 Cal.App.4th at p. 215 (conc. opn. of Fybel, J.).) The cited statutory sections tell us that (1) damages in a tort action are meant to compensate the victim in money for the detriment caused by the defendant's tort (Civ. Code, §§ 3281, 3333), but not to put the victim in a better position than he or she would have been in had the wrong not been done; and (2) economic damages are "objectively verifiable monetary losses," including compensation for "medical expenses," as opposed to noneconomic damages, which are for subjective, nonmonetary losses (Civ. Code, § 1431.2, subd. (b)). Based on these sources, Hanif concludes that, unless a gift is involved, an award of damages for past medical expenses in excess of their "actual[] cost" would, of necessity, constitute overcompensation. (Hanif, at p. 641.) Although this may be a correct inference for an uninsured individual paying directly for his or her own medical care, it is not true of the health care financing model that has evolved in this country, in which the cash paid or liability incurred to medical service providers is often not the entire consideration the providers receive in exchange for their services. As further discussed post, providers receive noncash, pecuniary consideration from their transactions with the patient's private insurers, which allows and induces them to accept a reduced rate for their services. Making the amount paid or incurred for medical care an absolute ceiling on a plaintiff's recovery for past medical care ignores this reality.[12]
(4) Comment h to section 911 of the Restatement is also inapposite. It states in essence that when an injured person pays less than the market rate for services rendered to him by third parties, he can recover no more than the amount paid unless the low rate was intended as a gift. Section 911 deals with tort damages generally. Out-of-state cases addressing the same issue before us have questioned comment h's applicability to valuing medical services financed by health insurance. (See Moorhead, supra, 765 A.2d at p. 795 (dis. opn. of Nigro, J.); Wills, supra, 892 N.E.2d at p. 1028; Bynum v. Magno, supra, 101 P.3d at p. 1159; White v. Jubitz Corp., supra, 219 P.3d at pp. 581-582.) The Restatement comment addressing the collateral source rule seems more on point than comment h: "[Collateral-source benefits] do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But it is the position of the *1329 law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance . . ., the law allows him to keep it for himself. If the benefit was . . . established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him." (Rest.2d Torts, § 920A, com. b, p. 514, italics added.) Further, comment f to section 924 of the Restatement instructs: "The value of medical services made necessary by the tort can ordinarily be recovered although they have created no liability or expense to the injured person, as when a physician donates his services." (Rest.2d Torts, § 924, com. f, p. 527.) To the extent that the rate discounts Yanez's health care providers accepted for her care were benefits of Yanez's health insurance, the Restatement, if anything, supports her position that she and not SOMA was entitled to reap their reward.
SOMA's witnesses at the Hanif hearing all testified that the amounts the providers wrote off of Yanez's bills were established pursuant to contracts between the providers and Yanez's health care insurers, Aetna and Healthnet. It is readily apparent that these writeoffs are an integral part of the consideration Yanez received for her (or her employer's) premium payments. That consideration accrued to her in two principal forms. First, the writeoffs reduced Yanez's out-of-pocket costs for any deductible or copayment or coinsurance percentage she was required to pay, or for any medical services subject to the writeoff that were not otherwise fully covered under her policies.[13] Thus, if the central purpose of investing in health insurance is to be protected from having to pay large medical bills, discounted provider charges deliver part of that protection.
Second, and equally important, the discounts reflect noncash, pecuniary savings in the cost of delivering health care services that are financed by Yanez's premium dollars. This was explained in Stanley v. Walker: "[T]hese contractual discounts confer significant benefits upon medical service providers in addition to just the cash received in discounted payments. In exchange for medical services, providers receive not only the insurer's payments, but also the pecuniary value of numerous additional benefits, among which are prompt payment, assured collectability, avoidance of collection costs, increased administrative efficiency, and significant marketing advantages. [¶] It is widely recognized that, by agreeing to reduced rates, providers gain significant administrative and marketing advantages, `including a large volume of business, rapid payment, ease of collection, and occasionally advance *1330 deposits.' Lawrence F. Wolper, Health Care Administration: Planning, Implementing, and Managing Organized Delivery Systems 553 (4th ed.2004) . . . ." (Stanley v. Walker, supra, 906 N.E.2d at p. 863 (dis. opn. of Dickson, J.).) In other words, the measure of the collateral benefit Yanez purchased for her premiums includes not only the cash Aetna and Healthnet paid for her medical care but the financial, administrative, and marketing savings the providers obtained that induced and permitted them to accept a discounted rate of payment for their services to her.
(5) Because of these marketplace realities, Hanif's holding that, as a matter of law, the reasonable value of medical services can never be greater than the cash paid or liability incurred for them cannot sensibly be extended to the private insurance context. Rate discounts negotiated between health insurers and providers must be deemed collateral benefits which, under the collateral source rule, should accrue to the insured plaintiff, not the defendant. Therefore, the trial court erred by reducing Yanez's economic damages for past medical expenses based on Hanif. To the extent the reasonable value of the provider's services was greater than the discounted amounts paid or incurred for those services, Yanez was entitled to the entire amount as damages under the collateral source rule. Since the jury found that $44,519.01 in damages for past medical expenses was reasonable, she was entitled to that amount, without reduction.
By so holding, however, we do not mean to suggest that discounted rates negotiated between health insurers and providers are always or even usually below the reasonable value of the services they cover, nor that the undiscounted amounts billed by providers are necessarily closer to reasonable value than the discounted amounts the providers negotiate with private health insurers. The pricing of medical services is a subject of tremendous complexity, and disputes over fair pricing in the health field abound. (See, e.g., Reinhardt, The Pricing Of U.S. Hospital Services: Chaos Behind A Veil Of Secrecy (2006) vol. 25, No. 1, Health Affairs 57 [suggesting, among other things, that both full and discounted charges established by hospitals for private payors tend to be significantly above true costs, in part to offset losses on Medicaid and uninsured patients]; Hospital Fair Pricing Act, Health & Saf. Code, § 127400 et seq. [requiring hospitals to establish fair pricing policies for uninsured low- and moderate-income patients].) But in this case, the jury heard evidence concerning the full amounts billed by Yanez's providers and determined those amounts were reasonable. We are bound by that determination.
It is also true the jury did not hear evidence of the sharply discounted amounts Aetna and Healthnet actually paid to the providers. Jurors might not have found $44,519.01 to be a reasonable damages award for past medical *1331 expenses if they had been informed that Yanez's health care providers had accepted $18,368.24 as full payment for their services. It could be argued that, in fairness, the jury as fact finder should have heard evidence of both the billed and discounted amounts since both are relevant to determining the reasonable value of the services involved. But that issue is beyond the scope of this appeal. First, no such request was made in the trial court. Instead, SOMA simply requested evidence of any unpaid amounts be excluded, while also readily conceding this position was legally untenable. SOMA clearly looked to a postverdict Hanif hearing as its remedy. More importantly, evidence Yanez's providers had agreed to accept reduced amounts for their services would have run afoul of the collateral source rule since jurors would have had to be given some explanation for how the discounts came about. However unfair it may have been to prevent the jury from hearing that evidence, this court is not empowered to provide redress. The collateral source rule is based on Supreme Court authority. If modifications to that rule are called for as a matter of fairness and good policy, only our Legislature or Supreme Court may make them.
We believe the alternative that has developed in the trial and appellate courts of this stateholding postverdict Hanif hearings in which the trial court hears evidence of the discounted amounts paid by private insurers and reduces the jury's verdictlacks a sound foundation as a matter of law or policy.

B. Code of Civil Procedure Section 998 Cost Award

The trial court believed it had no discretion to award Yanez her postoffer costs under Code of Civil Procedure section 998, or prejudgment interest under Civil Code section 3291, because her reduced damages award fell below her section 998 offer. Because Yanez's original damages award must now be restored, we will remand the case to the trial court to also exercise its discretion under Code of Civil Procedure section 998 and to award prejudgment interest under Civil Code section 3291.

III. DISPOSITION
The judgment is reversed and the case is remanded to the trial court to (1) enter a new judgment reinstating the damages established by the jury's verdict, (2) award prejudgment interest in accordance with Civil Code section 3291, and (3) exercise its discretion under Code of Civil Procedure section 998 whether to award plaintiff postoffer costs.
Dondero, J., concurred.
*1332 BANKE, J.,Concurring.
I concur in the opinion and judgment, but do so reluctantly and because of the current legal landscape. I write separately to discuss in detail the confusion in the law on the measure of damages for past medical expenses.
A historical overview of the case law reveals the measure of damages, which is fixed by statute, has become entangled with the collateral source rule, a judicially created doctrine that precludes otherwise recoverable damages from being reduced by benefits the plaintiff receives from an independent source. With the exception of damages for gratuitously provided medical services, our Supreme Court has never affirmatively endorsed a measure of damages for past medical expenses nearly certain to result in an economic windfall to the plaintiffthat is, an award that exceeds the dollar amount actually paid or owed (and thus required to be paid in the future) to a provider. As the majority opinion observes, courts in a number of other jurisdictions have either expressly or implicitly adopted a measure giving rise to this result in the context at issue here. And as discussed herein, our high court has given some indication it may also be inclined to take a view of compensatory damages broader than reimbursing the plaintiff for actual monetary loss, and which, instead, places on the defendant the full economic consequences of his or her tortious conduct.
Giving priority to a broader view of compensatory damages here, however, calls into question, once again, the evidentiary aspect of the collateral source ruleand compellingly so, given the realities of present day medical billing and payment practices. The majority opinion suggests it may be time to reexamine this aspect of the rule. I agree and submit it is time to let properly instructed juries make damages awards for past medical expenses based on all the relevant evidence.

"Incurred" Medical Expenses: A Pleading and Proof Issue
Early cases discussing the recovery of damages for past medical expenses often dealt with what was then a rule of pleading and proof, namely that a plaintiff could not prove "he has incurred a physician's bill under an allegation that he had paid it," and vice versa. (Donnelly v. Hufschmidt (1889) 79 Cal. 74, 76 [21 P. 546] (conc. opn. of McFarland, J.).) In Donnelly, for example, the plaintiff sufficiently alleged she had incurred medical expenses. The Supreme Court therefore held the trial court did not err in refusing to instruct the jury that "`nothing should be allowed plaintiff . . . for expenses incurred for nurse-hire, medicines, and doctor's bills, unless actually paid' by her." (Id. at p. 76, italics added.) The court confirmed, however, that an allegation the plaintiff has incurred medical expenses is sufficient to allow recovery: "The obligation to pay the surgeon for his services still rests on the *1333 plaintiff, and compensation for the detriment she has suffered could not be complete unless she was placed in a position to discharge herself from this obligation." (Ibid.) Under this pass-through rationale there is, of course, no windfall economic recovery by the plaintiff, it being presumed the plaintiff will pay the debt owed the provider, and thus the damages awarded for incurred medical expenses will ultimately rest in the hands of the provider.
In McLaughlin v. Railway Co. (1896) 113 Cal. 590 [45 P. 839], the plaintiff alleged he had paid medical expenses. (Id. at p. 591.) But at trial, he testified only that he had "incurred an indebtedness therefor which was not paid." (Ibid., italics added.) "[T]here is no doubt," stated the Supreme Court, "under a proper pleading, the injured party may recover for such necessary medical expenses as he may have become liable to pay, though not in fact paid before suit [is] brought." (Id. at p. 592.) However, evidence the plaintiff "had incurred a liability to pay [$750] was not admissible under the allegation of his complaint that he had expended such sum." (Ibid., italics omitted; see also Kimic v. San Jose-Los Gatos etc. Ry. Co. (1909) 156 Cal. 273, 275-276 [104 P. 312], italics added [allegation plaintiff had "`been compelled to pay . . . about [$1,000]'" in medical expenses sufficient to allow testimony that expenses to which plaintiff "had been put" were "`in the neighborhood of $500 or $600'"; and jury instructions, taken together and consistent with complaint, limited recovery to expenses "actually paid"].)

"Reasonable Value" of Medical Services
With pleading and proof issues raised by paid and incurred-but-not-paid medical bills largely resolved, the courts turned to issues involving the "reasonable value" of medical services. In Melone v. Sierra Railway Co. (1907) 151 Cal. 113, 115 [91 P. 522], for example, the Supreme Court considered a claim of instructional error where the jury was told it could award as one element of damage: "`Such sum as will compensate [the plaintiff] for the expense, if any, he has paid or incurred in the employment of a physician and the purchase of drugs during the time he was disabled by the injuries, not exceeding the amounts alleged in the complaint.'" (Ibid.) The defendant objected "the correct measure of damage in this regard is not the amount which [the plaintiff] may have paid or become liable for, but the necessary and reasonable value of such services as may have been rendered him." (Ibid.) The court restated this as "[s]uch reasonable sum, in other words, as has been necessarily expended or incurred in treating the injury" and agreed "[s]uch, unquestionably, is the true rule." (Ibid.) The court concluded the instructional error was harmless, however, since the "reasonableness of the expenses which plaintiff had incurred was not disputed." (Ibid.; see also Nelson v. Kellogg (1912) 162 Cal. 621, 623 [123 P. 1115] ["the rule established both in this state and elsewhere in actions for damages *1334 for tortious injuries, is that the recovery may include special damages properly pleaded, consisting of a liability, incurred but not paid, for reasonable and necessary expenses caused by the wrongful act complained of . . ."].)
In numerous cases, the courts addressed the evidentiary significance of the amount paid or incurred on the determination of the "reasonable value" of medical services. In Townsend v. Keith (1917) 34 Cal.App. 564, 565-566 [168 P. 402], the Court of Appeal held the plaintiff was properly allowed to answer a question asking "what bills he had incurred." (Id. at p. 565.) The court agreed with the defendant "the correct measure of damage is the necessary and reasonable value of the services rendered, rather than the amount which may have been paid for such services . . . ." (Ibid.) "[N]evertheless," said the court, "the amount paid for the services is some evidence as to their reasonable value." (Ibid.) The court also agreed the jury instructions were deficient in not telling the jury "to limit its finding to the reasonable value of the expenses incurred." (Id. at p. 566.) However, because the reasonableness of the expenses was not disputed, the instructional error was harmless. (Ibid.; see also Dewhirst v. Leopold (1924) 194 Cal. 424, 433 [229 P. 30] [rejecting argument no evidence was offered "to show that the amounts paid on account of medical treatment and attention were reasonable" because the "amount[] paid [itself] is some evidence of reasonable value" and where there is "no showing to the contrary such evidence must be held to be sufficient"]; Rogers v. Kabakoff (1947) 81 Cal.App.2d 487, 491 [184 P.2d 312] [evidence plaintiff paid amounts shown on statements of account was "some evidence of reasonable value" of medical services and sufficient to affirm judgment]; Shriver v. Silva (1944) 65 Cal.App.2d 753, 765-767 [151 P.2d 528] [no testimony hospital bills were "reasonable," but bills were admitted into evidence without objection, were itemized, and other witnesses testified to the seriousness of the plaintiff's injuries, providing sufficient basis to affirm judgment]; Latky v. Wolfe (1927) 85 Cal.App. 332, 346-347 [259 P. 470] [evidence of medical bills only, without "evidence of [reasonable] value of the services" or that plaintiff paid bills, not sufficient to affirm judgment].)
In Guerra v. Balestrieri (1954) 127 Cal.App.2d 511 [274 P.2d 443], the defendant challenged an instruction concerning the cost of medical care on the ground no evidence of the cost was introduced. The Court of Appeal again stated, "[t]he proper measure is the reasonable value of such services, not the amount paid or incurred therefor, although the amount paid or incurred would be some evidence of value." (Id. at p. 520.) The court also agreed "[t]here should be some evidence concerning the value of professional services of a physician and surgeon" and acknowledged no such evidence had been presented. (Ibid.) However, the court held the defendant suffered no prejudice because the instruction "expressly limited the recovery for such items to the reasonable value thereof `not exceeding the cost to the plaintiff,' *1335 and there was no evidence of any such cost . . . ." (Ibid.) Since no evidence of cost had been introduced, reasonable value must have been the benchmark of the award. (Ibid.; see also Dimmick v. Alvarez (1961) 196 Cal.App.2d 211, 216 [169 Cal.Rptr. 308] [It is not "necessary that the amount of the [damages] award equal the alleged medical expenses for it has long been the rule that the costs alone of medical treatment and hospitalization do not govern the recovery of such expenses. It must be shown additionally that the services were attributable to the accident, that they were necessary, and that the charges for such services were reasonable [citation]."].)
The assumption in these cases appears to have been that a provider might charge and a plaintiff might pay more than the "reasonable value" of the medical servicesthus, the rule that a plaintiff can recover only the "reasonable value" of such services, regardless of the amount paid or liability incurred therefor. These early cases could not, of course, have foreseen what has transpired in our health care delivery system. As the majority opinion notes (maj. opn., ante, at p. 1330), the concern that billed amounts may exceed the "reasonable value" of services provided is an acute one, given the realities of current medical billing and payment practices that force providers to anticipate significant writeoffs.[1]

*1336 Liability for Medical Expenses Not a Predicate to the Recovery of Damages

In addition to addressing the issue of "reasonable value," the courts also occasionally dealt with the issue of whether the plaintiff had to have paid, or become liable for, the claimed medical expenses in order to recover damages. This issue, which is entirely separate from the issue of "reasonable value," has been more problematic for the courts as an analytical matter. Clearly, the courts have been loath to deny damages for medical services required because of a defendant's negligent conduct, the sentiment being the wrongdoer, rather than the hapless plaintiff or erstwhile medical care provider, should bear the economic consequence of his or her wrongful conduct. The courts have thus invoked presumptions of liability to permit recovery, allowed recovery where liability was contingent upon the recovery of tort damages, and ultimately allowed recovery where the plaintiff had no legal liability at all for the medical service. This is also the issue that has led to the analytical entanglement of the measure of damages and the collateral source rule.
Mathes v. Aggeler & Musser Seed Co. (1919) 179 Cal. 697 [178 P. 713] (Mathes), is one of the earliest cases discussing whether liability for medical services is a predicate to the recovery of damages for their reasonable value. The plaintiff in Mathes was injured as the result of an automobile collision, and the defendants challenged the damages awarded for hospital expenses on the ground "there was no direct evidence of any contract between the plaintiff and the owners of the hospital that she was to pay for such treatment." (Id. at p. 700.) The Supreme Court rejected the argument, without citation to statutory or case authority. The court simply stated: "The law, of course, in the absence of evidence to show gratuitous service, would imply an agreement by her to pay the reasonable value. It was, therefore, proper for the plaintiff to introduce evidence as to the amount that would be a reasonable charge for the services." (Ibid.)
Some cases involved minor plaintiffs, who historically were not legally accountable for expenses associated with their maintenance and well being. In McManus v. Arnold Taxi Corp. (1927) 82 Cal.App. 215 [255 P. 755], for example, the minor plaintiff's father paid some, but not all, of the child's medical expenses. (Id. at pp. 222-223.) The defendant accordingly challenged the award of damages for past medical expenses made directly to the child. (Ibid.) The usual rule, explained the Court of Appeal, was that the parent could sue to recover medical expenses paid or incurred for the child, and the child could recover only general damages, for example, for his or her own pain and suffering. (Id. at p. 223.) There were exceptions, noted the court, where the child "has paid or is legally bound to pay" the expenses or is under *1337 a guardianship, such that the child's estate is legally liable for the expenses. The court also observed some jurisdictions viewed parents suing as guardians ad litem as having waived personal recovery, "such waiver operating in the nature of an emancipation" and allowing the child to recover. (Id. at p. 224.) Nevertheless, for reasons not pertinent to the discussion here, the appellate court refused to apply any of the exceptions and held the minor could not recover damages for his past medical expenses.
In Galwey v. Pacific Auto Stages, Inc. (1929) 96 Cal.App. 169 [273 P. 866], the defendant similarly challenged an award of damages to the minor plaintiff on the ground the mother "was liable for his necessities, including medical attention." (Id. at p. 178.) The mother, however, "was not able to pay the expenses and . . . she made no promise to do so." (Ibid.) Accordingly, the Court of Appeal upheld the award to the minor. "The services were necessary in order to save the life of the plaintiff, who would be liable for their reasonable value (Civ. Code, [§] 36)."[2] (Gatewey, at p. 178; see also Bauman v. San Francisco (1940) 42 Cal.App.2d 144, 162-163 [108 P.2d 989] ["The parents of a minor are normally responsible for medical and hospital care furnished the minor, and the cause of action to recover these items normally rests with the parents. But the child is also liable for the reasonable value of these expenses. Moreover, where the parents bring the action as guardians ad litem, and the bills have not been paid, and these expenses are pleaded, this constitutes a waiver of the parents' rights, and at least where contributory negligence of the parents is not asserted as a defense, the child may properly recover these items." (italics omitted)].)[3]
Other cases involved plaintiffs who, absent recovery in a lawsuit, were not otherwise liable for the cost of their medical care. In Reichle v. Hazie (1937) 22 Cal.App.2d 543 [71 P.2d 849] (Reichle), for example, the Court of Appeal considered the recovery of medical expenses by an indigent plaintiff treated at a county hospital. The record in the case indicated there were "two types" of patients from whom the county was supposed to seek reimbursement "`any patient who is admitted fraudulently . . . and is able to pay his bill'" and any patient who recovered tort damages for his injuries. (Id. at p. 547.) Thus, when a patient could pay, it was "the duty of the county officials to collect such charges from him." (Ibid.) When, however, a patient was "admitted to a hospital without an express contract to pay for his care and treatment," the law, "`in the absence of evidence to show gratuitous service, *1338 would imply an agreement . . . to pay the reasonable value' of the services rendered (Mathes [,supra,] 179 Cal. 697 . . .), subject to the limitations set forth in Goodall v. Brite."[4] (Reichle, at p. 547.) The question of a tort damages recovery by an impecunious patient being "one of first impression," the court could "see no good reason for denying the recovery of special damages where plaintiff was cared for in a public hospital when such recovery would be sustained had he been cared for and treated in a private hospital. Certainly there is just as sound reason in permitting such recovery where the money will go to a public institution to relieve the burden of public taxes as where it will go to a private institution to increase the profits of its stockholders." (Id. at pp. 547-548.)
Reichle, then, not only relied on the presumption of liability set forth in Mathesbased on an implied agreement to pay for the reasonable value of medical services receivedit stretched that presumption to allow the recovery of damages for medical expenses on a more attenuated basis, since the plaintiff's liability for medical expenses in Reichle was apparently only inchoate and depended upon whether he sued and recovered tort damages. There would be no windfall recovery by the plaintiff, however, since the hospital would ultimately receive the damages awarded for the medical services it had provided.[5]
In Purcell v. Goldberg (1939) 34 Cal.App.2d 344 [93 P.2d 578] (Purcell), the Court of Appeal addressed the recovery of medical expenses by a plaintiff who was covered by a health care plan, the provisions of which are not detailed in the opinion. The defendant challenged the damages award for past medical expenses on several grounds, including that the plaintiff was covered by the health plan. Citing Reichle, the Court of Appeal stated: "Nor was respondent precluded as a matter of law from recovering the amount of the medical fee incurred for the services of [the physician] merely because she belonged to an association with which he was connected, and which provided *1339 in its contract with its members that as such they were liable for the medical services only in case they recovered damages." (Purcell, at p. 350.) Thus, as in Reichle, the plaintiff's liability for the physician's services was apparently inchoate and depended upon whether she sued and recovered damages.
The Supreme Court cited both Reichle and Purcell in a footnote in Helfend v. Southern Cal. Rapid Transit Dist. (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 61] (Helfend), at the end of a string of case citations illustrating the proposition that the collateral source rule "embodies the venerable concept that a person who has invested years of insurance premiums to assure his medical care should receive the benefits of his thrift." (Id. at pp. 9-10 & fn. 14.) The court's use of a "see also" signal before the two case citations appears to acknowledge that while Reichle and Purcell may implicitly illustrate the operation of the collateral source rule, neither case mentioned it. Rather, both cases dealt with the issues before them as damages issues, i.e., whether the claimed medical expenses were legally recoverable damages. (Purcell, supra, 34 Cal.App.2d at p. 350; Reichle, supra, 22 Cal.App.2d at p. 547.) Moreover, both cases grounded their holdings on Mathes (Reichle cited to Mathes, and Purcell cited to Reichle), which also dealt with whether certain medical expenses were legally recoverable damages and in which the Supreme Court invoked a presumption of liability to uphold the damages award. (Mathes, supra, 179 Cal. at p. 700; Purcell, at p. 350; Reichle, at pp. 547-548.)
Finally, there are the cases in which plaintiffs received gratuitous medical services. One of the oldest is Kimball v. Northern Electric Co. (1911) 159 Cal. 225 [113 P. 156] (Kimball), in which the mother of a teenager severely injured in a train accident sued as his guardian ad litem to recover damages, including for personal injuries. The defendant challenged the damages awarded for the reasonable value of nursing services provided by the mother (who was a registered nurse) on the ground the plaintiff was not obligated to pay for them. (Id. at pp. 231-232.) The Supreme Court upheld the award, again without citation to statutory or case authority. Observing the plaintiff did not live at home, the court stated "the mere fact of their relationship does not remove the presumption that he was bound by the acceptance of her services to pay a reasonable value for them." (Id. at p. 231.) Thus, Kimball also was predicated on presumed liability for the reasonable value of the medical services the plaintiff received, untethered to any statutory or express contractual obligation, and without regard to whether it was likely the mother would demand payment from her severely injured son.
The Supreme Court also cited Kimball in Helfend as illustrating the difference between a medical provider attempting to recover directly from a tortfeasor (a scenario outside the collateral source rule) and a plaintiff *1340 recovering damages where "friends and relatives render assistance to the injured plaintiff with the expectation of repayment out of any tort recovery" (a scenario in which "the [collateral source] rule has been applied"). (Helfend, supra, 2 Cal.3d at p. 6, fn. 5.) But, again, while Kimball may implicitly illustrate the operation of the collateral source rule, it made no mention of it. Rather, the issue in Kimball was whether damages awarded to the son for the reasonable value of the nursing services provided by his mother were legally recoverable. The court held they were by presuming the son "was bound by acceptance of her services to pay a reasonable value for them." (Kimball, supra, 159 Cal. at p. 231.)
In Fifield Manor v. Finston (1960) 54 Cal.2d 632 [7 Cal.Rptr. 377, 354 P.2d 1073] (Fifield Manor), the Supreme Court considered the attempt of a health care provider to recover the cost of medical services directly from a tortfeasor. The provider had entered into a "life-care contract" with one Ross, who died from injuries sustained in a car accident. The provider claimed a direct right of recovery from the defendant and, alternatively, a subrogated right under the life-care contract. (Id. at p. 634.) In rejecting any direct right against the tortfeasor, the court observed no case supported such a right of action and concluded "to so hold would constitute an unwarranted extension of liability for negligence." (Id. at pp. 636-637.)
Of interest here is the court's further observation, "[n]or is it true, as plaintiff argues, that because it paid for the medical care and treatment under its contract, the decedent's estate has no cause of action for the cost of such treatment against the defendants. The fact that either under contract or gratuitously such treatment has been paid for by another does not defeat the cause of action of the injured party to recover the reasonable value of such treatment from the tortfeasor." (Fifield Manor, supra, 54 Cal.2d at p. 637.) The Supreme Court cited to Purcell and Reichle (Fifield Manor, at p. 637) which, as discussed above, relied on the presumed obligation to pay for medical services the court articulated in Mathes (and in Kimball) and stretched that presumption to allow recovery where the plaintiff's legal liability for medical services was inchoate and dependent on a successful lawsuit (Purcell, supra, 34 Cal.App.2d at p. 350; Reichle, supra, 22 Cal.App.2d at pp. 547-548). The Supreme Court did not discuss whether the life-care contract specified that Ross would be legally liable to pay for the medical services he received if he recovered damages for such. But even if that were the case, the court's citation to Purcell and Reichle would not support its inclusion of gratuitously provided medical services among those for which Ross's estate could seek damages for their reasonable value.
However, the court in Fifield Manor also cited Gastine v. Ewing (1944) 65 Cal.App.2d 131 [150 P.2d 266] (Gastine). The issue in Gastine was whether *1341 the plaintiff could recover damages for medical treatment provided by an unlicensed physician. (Id. at p. 143.) The Court of Appeal assumed the plaintiff paid for the services. (Ibid.) Accordingly, whether payment of, or liability for, the medical expenses was a predicate to the recovery of damages was not an issue in the case. Nevertheless, in concluding the physician's licensing status was not a barrier to recovery, the court cited to Purcell and Reichle, as well as several American Law Reports sections, including one specifically addressing the recovery of damages for the reasonable value of gratuitously provided medical services. That section stated: "`In a majority of the cases the position is taken that the [gratuitous] services were rendered for the benefit of the injured plaintiff, that the defendant, the wrongdoer, should not be permitted to profit by any gratuity extended to his victim, and that consequently the reasonable value of such services may be recovered.' "(Gastine, at pp. 143-144, quoting Annot., DamagesPersonal Injuries Gratuitous Care (1940) 128 A.L.R. 686.)
A little over a decade later, the Supreme Court decided Rodriguez v. Bethlehem Steel Corp. (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669] (Rodriguez I), in which the court recognized a cause of action for loss of consortium by the spouse of an injured plaintiff and reversed a judgment dismissing the wife's claim following the sustaining of demurrers without leave to amend. (Id. at pp. 387-408.) Of significance here is the court's discussion of the damages recoverable by the plaintiffs on remand. The court held the wife could not recover the reasonable value of the round-the-clock nursing services she provided to her husband. (Id. at p. 409.) This was because, should the husband "prevail in his own cause of action against these defendants, he will be entitled to recover, among his medical expenses, the full cost of whatever home nursing is necessary." (Ibid.) To allow the wife to recover for this medical service, as well, would "constitute double recovery." (Ibid.) The court cited no authority, nor provided any analysis supporting, the husband's recovery of the reasonable value of the gratuitously provided nursing expenses as compensatory tort damages.
After remand and trial, the defendants appealed from the judgment for the plaintiffs. Rodriguez v. McDonnell Douglas Corp. (1978) 87 Cal.App.3d 626 [151 Cal.Rptr. 399] (Rodriguez II). Among other things, the defendants challenged the award of damages to the husband for the attendant care provided by the wife. (Id. at pp. 660-662.) The Court of Appeal pointed out that in Rodriguez I, the Supreme Court had held the husband was entitled to recover "`among his medical expenses, the full cost of whatever home nursing is necessary.'" (Rodriguez II, at p. 662, quoting Rodriguez I, supra, 12 Cal.3d at p. 409.) The defendants nevertheless argued no recovery was proper because the husband had not paid or incurred liability for the nursing services; rather, they were provided gratuitously. (Rodriguez II, at p. 662.) *1342 The court rejected this argument, stating "[i]nsofar as gratuities are concerned, the rule appears to be in keeping with the collateral source rule rationale." (Ibid.) The court also cited Fifield Manor for the proposition that" `[t]he fact that either under contract or gratuitously such [medical] treatment has been paid for by another does not defeat the cause of action of the injured party to recover the reasonable value of such treatment from the tortfeasor.' "(Rodriguez II, at p. 662, quoting Fifield Manor, supra, 54 Cal.2d at p. 637.)
Thus, in Rodriguez II, the Court of Appeal blurred, if not conflated, the measure of damages and the collateral source rule. The court elsewhere observed in its opinion, however, that, as to the wife, it was "not part of her duties as a wife to render 24-hour-a-day attendant care." (Rodriguez II, supra, 87 Cal.App.3d at p. 661.) The situation therefore was arguably analogous to that in Kimball, where the Supreme Court held the mother-son relationship did "not remove the presumption that [the son] was bound by the acceptance of [the mother's nursing] services to pay a reasonable value for them." (Kimball, supra, 159 Cal. at p. 231.)
This line of cases, beginning with Kimball and Mathes and culminating with Rodriguez I and II, is analytically significant for two reasons. First, these cases indicate that whether the plaintiff is liable for claimed medical expenses has ultimately not been a very significant issue, and is an issue that has never barred the recovery of compensatory damages. Where medical services have been provided as a wholly gratuitous matter, these cases make clear the plaintiff need not have paid nor incurred liability for the services to recover compensatory damages for their reasonable value. (See Rodriguez I, supra, 12 Cal.3d at p. 409; Fifield Manor, supra, 54 Cal.2d at p. 637; Mathes, supra, 179 Cal. at p. 700; Rodriguez II, supra, 87 Cal.App.3d at p. 662; Gastine, supra, 65 Cal.App.2d at pp. 143-144.) Where medical services have been provided quasi gratuitously, i.e., with an expectation of payment if the plaintiff recovers damages, the plaintiff likewise need not have paid nor incurred liability for the services to recover compensatory damages for their reasonable value. (See Kimball, supra, 159 Cal. at p. 231; Reichle, supra, 22 Cal.App.2d at p. 547; cf. Helfend, supra, 2 Cal.3d at p. 6, fn. 5.) In all other cases, the plaintiff has paid or been expressly liable for the medical services, or the courts have presumed liability for the reasonable value of such services. (See Mathes, supra, 179 Cal. at p. 700; Kimball, supra, 159 Cal. at p. 231; Bauman v. San Francisco, supra, 42 Cal.App.2d at pp. 162-163; Reichle, supra, 22 Cal.App.2d at p. 547.) In short, by permitting the recovery of compensatory damages for gratuitously provided medical services and recognizing an implied obligation to pay the reasonable value of any nongratuitously provided medical services, the courts have effectively made the plaintiff's liability for medical services a nonissue for purposes of recovering compensatory damages for past medical expenses.
*1343 Secondly, this line of cases reflects that the courts have embraced a view of compensatory damages for past medical expenses broader than reimbursing amounts actually paid or owed to providers. If compensatory damages were legally limited to such amounts, the law could not permit the recovery of such damages for the reasonable value of gratuitously provided medical services since, by definition, the plaintiff has neither paid nor incurred liability for such services. Thus, in order to permit the recovery of compensatory damages for gratuitously provided medical services, the courts necessarily had to adopt the view that compensatory damages not only provide economic reimbursement to the plaintiff for actual dollars expended or owed, but also are concerned with placing the full economic consequences of wrongful conduct on the defendant. (See Fifield Manor, supra, 54 Cal.2d at p. 637, citing Gastine, supra, 65 Cal.App.2d at pp. 143-144.) This is, moreover, a matter of legally recoverable damages, and not a consequence of the collateral source rule. The collateral source rule does not create or give rise to damages not otherwise recoverable by statute. Rather, the collateral source rule precludes otherwise recoverable damages from being reduced by benefits received by the plaintiff from a collateral source. (See Helfend, supra, 2 Cal.3d at p. 6 [Supreme Court has long adhered to doctrine that collateral benefits "should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor"]; Anheuser-Busch, Inc. v. Starley (1946) 28 Cal.2d 347, 349 [170 P.2d 448] [an action "against the wrongdoer for the damages suffered is not precluded nor is the amount of damages reduced by the receipt by him of payment for his loss from a source wholly independent of the wrongdoer"].)

The Damages Debate Over Medical Expense Writeoffs
In Hanif v. Housing Authority (1988) 200 Cal.App.3d 635, 637-644 [246 Cal.Rptr. 192] (Hanif), the Court of Appeal addressed the one scenario not addressed by the cases discussed abovewhere the plaintiff has paid, or incurred express liability for, an amount ostensibly less than the "reasonable value" of the medical services required because of the defendant's tortious conduct.[6]Hanif concluded that, in this context, the measure of damages is not the reasonable value of such services, but the lesser of the reasonable value of such services or the amount the plaintiff paid, or incurred liability, therefor. (Id. at pp. 643-644.)
As the majority opinion recounts, in Hanif, the minor plaintiff was hit by a car and severely injured. During trial, and over the defendant's objection, the plaintiff introduced evidence the "reasonable value" of the physician services *1344 he received was $4,618 (whereas Medi-Cal paid only $2,823) and the "reasonable value" of hospital services was $27,000 (whereas Medi-Cal paid only $16,494). (Hanif, supra, 200 Cal.App.3d at pp. 638-639.) The differences in the amounts were written off by the providers following payment by the government, and there was no evidence the plaintiff was legally liable for the written off amounts. (Id. at p. 639.) The trial court, sitting as the trier of fact, awarded the plaintiff the "reasonable value" of the medical expenses. (Ibid.) The defendant appealed, arguing the trial court had "erred in its application of the controlling measure of damages" and the plaintiff's recovery for these medical services should have been "limited to the amount actually paid." (Ibid.) The Court of Appeal agreed.
The court began by noting "there is no question here that Medi-Cal's payment for all injury-related medical care and services does not preclude plaintiff's recovery from defendant, as special damages, of the amount paid. This follows from the collateral source rule." (Hanif, supra, 200 Cal.App.3d at pp. 639-640.) Thus, even though the plaintiff was a Medi-Cal beneficiary and could not be said to have been prescient in securing the government payments, the court had no difficulty applying the collateral source rule to this government benefit.[7] (See Lund v. San Joaquin Valley Railroad (2003) 31 Cal.4th 1, 9-10 [1 Cal.Rptr.3d 412, 71 P.3d 770] [the "`collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities'"], quoting Helfend, supra, 2 Cal.3d at p. 10.)[8]
*1345 The court next stated there was no "question about the appropriate measure of recovery: a person injured by another's tortious conduct is entitled to recover the reasonable value of medical care and services reasonably required and attributable to the tort." (Hanif, supra, 200 Cal.App.3d at p. 640.) Rather, the question, said the court, concerned the "the application of that measure" and specifically "whether the `reasonable value' measure of recovery means that an injured plaintiff may recover from the tortfeasor more than the actual amount he paid or for which he incurred liability for past medical care and services." (Ibid.) It concluded "[f]undamental principles underlying recovery of compensatory damages in tort actions" compelled a "no" answer. (Ibid.) The court cited to sections 3281,[9] 3282,[10] and 3333,[11] and Witkin (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 842, p. 3137), and pointed out tort damages awards are compensatory in character and not intended to provide an economic windfall to the plaintiff. (Hanif, at pp. 640-641.)
The Court of Appeal then stated "medical expenses fall generally into the category of economic damages, representing actual pecuniary loss caused by the defendant's wrong." (Hanif, supra, 200 Cal.App.3d at p. 641.) In support of this statement, the court cited section 1431.2, subdivision (b)(1). (Hanif, at p. 641.) Section 1431.2 was added to the Civil Code by Proposition 51 and modifies the common law doctrine of joint and several liability. (Evangelatos v. Superior Court (1988) 44 Cal.3d 1188, 1192 [246 Cal.Rptr. 629, 753 P.2d 585].) The statute uses the terminology "economic" and "non-economic" damages, leaving joint and several liability intact as to the former, but imposing only several liability, proportional to fault, as to the latter.[12] (§ 1431.2, subd. (a); Evangelatos, at p. 1192.) However, while Proposition 51 modified the nature and extent of a defendant's liability for a plaintiff's recoverable damages, it did "not purport to alter either the measure or total amount of damages that a plaintiff may recover for a particular tort." (Evangelatos, at p. 1224; see id. at p. 1230, fn. 1 (conc. & dis. opn. of Kaufman, J.).)
*1346 The Hanif court posited confusion as to the meaning of "reasonable value" may have arisen because of comments to BAJI No. 14.10 which explain the "reasonable value of medical and nursing care may be recovered although rendered gratuitously or paid by a source independent of the wrongdoer." (BAJI No. 14.10; see Hanif, supra, 200 Cal.App.3d at p. 641.) This, said the court, "merely restate[d] the collateral source rule," which was "not an issue" in the case; rather, the issue was "the import of the term `reasonable value' when applied to past medical services, to which neither BAJI No. 14.10 nor its comment provide any clue." (Hanif, at p. 641.) However, as discussed above, the recovery of compensatory damages for the reasonable value of gratuitously provided medical services is a matter of legally recoverable damages, and not a consequence of the collateral source rule which precludes otherwise recoverable damages from being reduced by collateral benefits received by the plaintiff. Accordingly, the BAJI note is not simply a restatement of the collateral source rule; it also recites an established principle of recoverable damages. The court further stated "`[r]easonable value' is a term of limitation, not of aggrandizement," citing to section 3359.[13] (Hanif, at p. 641.)
The Hanif court thus concluded, "when the evidence shows a sum certain to have been paid or incurred for past medical care and services, whether by the plaintiff or by an independent source, that sum certain is the most the plaintiff may recover for that care despite the fact it may have been less than the prevailing market rate." (Hanif, supra, 200 Cal.App.3d at p. 641.) The court followed this with citations to Melone v. Sierra Railway Co., supra, 151 Cal. 113; Townsend v. Keith (1917) 34 Cal.App. 564 [168 P. 402]; Castro v. Giacomazzi (1949) 92 Cal.App.2d 39 [206 P.2d 688]; and Guerra v. Balestrieri, supra, 127 Cal.App.2d 511. (Hanif, at pp. 641-643.) "Implicit in" these cases, said the court, "is the notion that a plaintiff is entitled to recover up to, and no more than, the actual amount expended or incurred for past medical services so long as that amount is reasonable." (Id. at p. 643.) As discussed above, the principal concern in these cases appears to have been providers might have charged and plaintiffs might have paid more than the "reasonable value" of the medical services, and therefore regardless of how much the plaintiffs paid or incurred, they were limited to recovering the reasonable value of such services.
The Court of Appeal additionally pointed to a comment on "value" in the Restatement Second of Torts: "`When the plaintiff seeks to recover for expenditures made or liability incurred to third persons for services rendered, normally the amount recovered is the reasonable value of the services rather *1347 than the amount paid or charged. If, however, the injured person paid less than the exchange rate, he can recover no more than the amount paid, except when the low rate was intended as a gift to him.'" (Hanif, supra, 200 Cal.App.3d at p. 643, italics omitted, quoting Rest.2d Torts, § 911, com. h, pp. 476-477.)
The Hanif court thus held the trial court erred in awarding the plaintiff "the reasonable value" of the physician and hospital services he had received. (Hanif, supra, 200 Cal.App.3d at p. 644.) Because the defendant did not dispute the amounts paid by Medi-Cal were "reasonable," the court did not reverse, but modified the judgment to award only those amounts as the recoverable damages for physician and hospital services. (Ibid.)
The Court of Appeal then turned to the minor plaintiff's recovery of damages for the reasonable value of the home attendant care provided by his parents. (Hanif, supra, 200 Cal.App.3d at pp. 644-646.) The plaintiff had not, of course, paid or incurred liability for this medical service. Echoing the Restatement section and comment on "value" it had quoted earlier, the court stated "[i]t is established that `[t]he reasonable value of nursing services required by the defendant's tortious conduct may be recovered from the defendant even though the services were rendered by members of the injured person's family and without an agreement or expectation of payment. . . .' "(Id. at pp. 644-645, quoting 22 Am.Jur.2d Damages, § 207, pp. 288-289 & citing Rodriguez II, supra, 87 Cal.App.3d at p. 662.)
Thus, Hanif is a rather unique case. As to medical services for which a plaintiff has paid or expressly incurred liability, the court held compensatory damages are limited to the lesser of the reasonable value of such services or the amount the plaintiff paid or incurred liability therefor. Thus, in this context, the Court of Appeal gave priority to that aspect of compensatory damages that insures the plaintiff is reimbursed for actual economic loss. As to gratuitously provided medical services, however, the court agreed a plaintiff is entitled to recover the reasonable value of such services. In this context, the court necessarily gave priority to that aspect of compensatory damages that places on a defendant the full economic consequence of his or her wrongful conduct.
As the majority opinion recites, this court applied Hanif's measure of damages analysis as to nongratuitous medical services in Nishihama v. City and County of San Francisco (2001) 93 Cal.App.4th 298, 306-307 [112 Cal.Rptr.2d 861] (Nishihama). In Nishihama, the plaintiff presented evidence of the "normal rates" charged by the hospital for the care she received. However, pursuant to its contractual arrangement with the plaintiff's health care plan, the hospital accepted a significantly lower amount as payment in *1348 full. The jury, unaware of the payment because of the evidentiary aspect of the collateral source rule, returned a verdict based on the "normal rates." (Ibid.) The defendant appealed, arguing the trial court erred in permitting the jury to award damages based on the provider's "normal rates" rather than on the amount paid. (Id. at p. 307.) The plaintiff argued she was entitled to an award based on the "normal rates" because the hospital had filed a lien under the state's Hospital Lien Act (HLA). (Nishihama, at p. 307). The court rejected this argument, holding the extent of such a lien is limited to the amount a hospital is "entitled to receive" as payment for its services, which "turns on any agreement it has with . . . the injured person's insurer." (Id. at pp. 307-308.) The court further held the HLA does not create an independent cause of action in favor of hospitals; rather, the statutory lien is based on a" `debt owed by plaintiff to the [h]ospital.'" (Nishihama, at p. 308, quoting Grauberger v. St. Francis Hospital (N.D.Cal. 2001) 149 F.Supp.2d 1186, 1191, vacated on unrelated grounds by Grauberger v. St. Francis Hospital (N.D.Cal. 2001) 169 F.Supp.2d 1172, 1180.) The Supreme Court agreed with this construction of the HLA in Parnell v. Adventist Health System/West (2005) 35 Cal.4th 595, 600-609 [26 Cal.Rptr.3d 569, 109 P.3d 69] (Parnell).
Because the plaintiff owed no debt to the hospital, it having accepted the insurer's payment as payment in full, the hospital had no valid lien. The plaintiff therefore could not rely on the HLA, and the Nishihama court held the trial court erred in allowing the jury to award damages based on the hospital's "normal rates," citing Hanif. (Nishihama, supra, 93 Cal.App.4th at pp. 306, 309.) The court concluded the error was harmless, however, because "[t]here is no reason to assume that the usual rates provided a less accurate indicator of the extent of the plaintiff's injuries than did the [insurer's] specially negotiated rates . . . ." (Ibid.) Indeed, the court stated "the opposite is more likely to be true"the hospital's "normal rates" may more accurately indicate the extent of the plaintiff's injuries. (Ibid.) Following Hanif's approach, the court modified the judgment to award as past medical expenses only those amounts paid by the insurer. (Nishihama, at p. 309.)
Hanif and Nishihama thus gave rise to the postverdict, damages reduction procedure known as a "Hanif/Nishihama" motion. (Greer v. Buzgheia (2006) 141 Cal.App.4th 1150, 1155 [46 Cal.Rptr.3d 780].) In Greer, the defendant argued the jury should not be allowed to hear evidence "that the reasonable value of the medical services exceeded the amount actually paid, since no one will be obligated to pay the difference," the bills having been settled in full by the plaintiff's employer. (Id. at p. 1154.) The trial court allowed the evidence, but with the proviso that if the medical expenses awarded exceeded the amount paid, it would entertain a postverdict motion for reduction pursuant to Hanif. (Greer, at p. 1154.) The defendant, however, failed to request a special verdict form that segregated out past medical expenses, and the trial court therefore refused to reduce the award. (Id. at pp. 1154-1155.) *1349 The defendant appealed, arguing the trial court initially erred in allowing evidence of the reasonable value of the medical expenses to be presented to the jury and further erred by failing to reduce the verdict. (Id. at pp. 1156-1157.) The Court of Appeal (the same court that decided Hanif) held the trial court did not abuse its discretion in allowing the evidence. (Greer, at p. 1157.) "The [trial] court's ruling was correct. Nishihama and Hanif stand for the principle that it is error for the plaintiff to recover medical expenses in excess of the amount paid or incurred. Neither case, however, holds that evidence of the reasonable cost of medical care may not be admitted. Indeed, Nishihama suggests just the opposite . . . ." (Id. at p. 1157.) As for postverdict reduction of the award, the court held the defendant waived the issue by failing to request a verdict that segregated medical expenses. (Id. at pp. 1157-1158.) "[I]t was, for all practical purposes, impossible to calculate a Hanif/Nishihama reduction." (Id. at p. 1158.)
As the majority opinion further discusses, Hanif was subsequently discussed in Olsen v. Reid (2008) 164 Cal.App.4th 200 [79 Cal.Rptr.3d 255] (Olsen). In Olsen, the plaintiff introduced evidence her providers billed $62,475.81 for medical services. (Id. at p. 202.) The defendant sought to introduce evidence of the amounts actually paid by the plaintiff's insurance carriers. (Ibid.) The trial court refused to allow this evidence, and instead reduced the jury's $250,000 award for "`past economic loss, including medical expenses,'" by $57,394.24, supposedly the amount written off by the providers after receiving payment from the carriers. (Ibid.) The Court of Appeal reversed. The majority opinion concluded that regardless of whether a Hanif/Nishihama reduction might otherwise be permissible, the record did not allow it because "it was far from clear" what medical expenses were paid and what amounts were written off. (Olsen, at p. 203.)
Two concurring opinions expressed differing views on the Hanif/Nishihama postverdict reduction procedure. The first concurring opinion, by Justice Moore, sounded "the bell of alarm" that Hanif had "divorced the collateral source rule from the complicated area of medical insurance." (Olsen, supra, 164 Cal.App.4th at p. 204 (conc. opn. of Moore, J.).) She suggested Hanif did not see "the connection between `reasonable value' and the long line of cases on the collateral source rule," since Hanif "simply stat[ed], without analysis, that the collateral source rule did not apply." (Olsen, at p. 210.) In her view, Hanif "changed the emphasis from a plaintiff's entitlement under the collateral source rule [citation] to `a plaintiff is entitled to recover up to, and no more than, the actual amount expended or incurred for past medical services so long as that amount is reasonable." (Olsen, at p. 210.) She observed our Supreme Court has not yet addressed the issue and that "[m]uch has changed since the collateral source rule first entered our jurisprudence," including in the area of billing and paying for medical services and the enactment of legislation eliminating the collateral source rule *1350 in medical malpractice cases. (Id. at pp. 212-213.) She therefore would reject the Hanif/Nishihama postverdict reduction procedure in cases involving private insurance, and leave it to the Legislature to make any further changes in the collateral source rule. (Olsen, at pp. 213-214.) What Justice Moore's concurrence does not address is the analytical distinction between the measure of damages and the collateral source rule.
The second concurring opinion, by Justice Fybel, endorsed the reasoning of Hanif as "soundly based on California statutesCivil Code sections 3281, 3282, 3333, and 1431.2, subdivision (b)(1)and the Restatement Second of Torts, section 911, comment h." (Olsen, supra, 164 Cal.App.4th at p. 215 (conc. opn. of Fybel, J.), fns. omitted.) In his view, Hanif and Nishihama also correctly followed the collateral source rule "because the plaintiffs in those cases recovered all medical costs actually incurred, even though the costs were paid by others (e.g., a health plan)." (Olsen, at pp. 215-216.) What Justice Fybel's concurrence does not address is the tension between that aspect of compensatory damages that insures the plaintiff is reimbursed for any actual economic loss, and that aspect of compensatory damages that places on a defendant the full economic consequences of his or her wrongful conduct.

Supreme Court Cases Involving Medical Expense Writeoffs
Our Supreme Court has not addressed the measure of damages for past medical expenses where the plaintiff has paid, or incurred express liability for, an amount ostensibly less than the reasonable value of the services rendered, and specifically has not addressed the issue of medical expense writeoffs in this context. Nevertheless, the court has decided several cases that bear mention in this regard.
The first is Fein v. Permanente Medical Group (1985) 38 Cal.3d 137 [211 Cal.Rptr. 368, 695 P.2d 665] (Fein). In Fein, the court upheld the validity of section 3333.1, subdivision (a), which was enacted as part of the Medical Injury Compensation Reform Act (MICRA). Section 3333.1 permits a defendant in a medical malpractice case to introduce evidence of collateral source benefits received by the plaintiff. The plaintiff, in turn, can introduce evidence of amounts he or she has paid (in insurance premiums, for example) to secure the benefits. (Fein, at p. 164.)
What is of interest with respect to the measure of damages, is the court's observation that while section 3333.1, subdivision (a), allows the introduction of evidence of collateral source benefits, the statute "does not specify how the jury should use the evidence." (Fein, supra, 38 Cal.3d at pp. 164-165.)" `Earlier drafts of section 3333.1, subdivision (a) required the trier of fact to *1351 deduct such collateral source benefits in computing damages, butas enactedsubdivision (a) simply provides for the admission of evidence of such benefits, apparently leaving to the trier of fact the decision as to how such evidence should affect the assessment of damages.'" (Id. at p. 165, fn. 21, quoting Barme v. Wood (1984) 37 Cal.3d 174, 179, fn. 5 [207 Cal.Rptr. 816, 689 P.2d 446].) "Although section 3333.1, subdivision (a)as ultimately adopteddoes not specify how the jury should use such evidence, the Legislature apparently assumed that in most cases the jury would set plaintiff's damages at a lower level because of its awareness of plaintiff's `net' collateral source benefits." (Fein, at pp. 164-165.) The court noted, however, the parties and trial court apparently had assumed, incorrectly, that section 3333.1, subdivision (a), required collateral source benefits to be deducted from a damages award. (Fein, at p. 165, fn. 21.) Not so, explained the court. The statute "simply authorizes the reduction of damages on the basis of collateral source benefits, but does not specifically mandate such a reduction." (Ibid.; see also Hernandez v. California Hospital Medical Center (2000) 78 Cal.App.4th 498, 505-506 [93 Cal.Rptr.2d 97].)
Thus, under section 3333.1, subdivision (a), in determining the amount of damages for past medical expenses in a medical malpractice case, the jury can hear all the evidence relevant to determining the "reasonable value" of the medical servicesboth evidence of amounts charged by providers and amounts paid thereto by the plaintiff or collateral sources (and no doubt often accepted as payment in full). Because the statute does not specify how the jury is to evaluate or use such evidence, it also leaves open the possibility of damages awards for past medical expenses that exceed the amounts paid to providers (and accepted as payment in full), as well as awards that are less than initial provider billings. Under Hanif's measure of damages analysis, however, a damages award exceeding amounts paid to and accepted by providers as payment in full would exceed what is legally recoverable.[14]
The second case of interest is Olszewski v. Scripps Health (2003) 30 Cal.4th 798 [135 Cal.Rptr.2d 1, 69 P.3d 927] (Olszewski). In Olszewski, the Supreme *1352 Court invalidated on federal preemption grounds two state statutes (Welf. & Inst. Code, former §§ 14124.791 & 14124.74) that allowed providers to file liens against tort recoveries obtained by Medi-Cal beneficiaries. (30 Cal.4th at p. 826.) "While federal law requires the state Medicaid agency to obtain full reimbursement of Medicaid payments whenever possible [achieved by way of mandatory assignment of a beneficiary's right to recover damages for medical expenses from third parties], it strictly limits the ability of providers to obtain reimbursement for their services. Even though Medicaid payments are typically lower than the amounts normally charged by providers for their services [citation], `[a] State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual' [citation]." (Olszewski, at p. 812.) Providers are thus prohibited from collecting any amounts from beneficiaries, except for very limited amounts defined in the federal statute. (Id. at pp. 812, 819.) Because the state lien statutes allowed providers to recover their "full customary charge" from beneficiaries, the court held the statutes directly conflicted with the federal statutory limitations on provider recoveries from Medicaid beneficiaries. (Id. at pp. 820-822, italics omitted.)
Of interest with respect to the measure of damages is the court's discussion of a policy directive issued by the Acting Director of the Medicaid Bureau that would permit additional provider recovery from a beneficiary's tort recovery." `[F]ederal law would not preclude the practice of providers pursuing payment in tort situations in excess of Medicaid reimbursement' as long as a state satisfies two conditions. First, the state must assure that Medicaid is made whole before the provider recovers any money. Second, the state must protect the assets of Medicaid beneficiaries by limiting provider recovery to the portion of the award specifically allocated for the beneficiary's medical expenses." (Olszewski, supra, 30 Cal.4th at pp. 821-822.) While the state lien laws met the first requirement, they did not meet the second because they did not limit recovery to the portion of recovery allocated to medical expenses. (Id. at p. 822.)
The court therefore invalidated the state lien laws, but did so "reluctantly." (Olszewski, supra, 30 Cal.4th at p. 826.) "By invalidating liens filed pursuant to section 14124.791, we give the third party tortfeasor a windfall at the expense of the innocent health care provider. Because the provider may no longer assert a lien for the full cost of its services, the Medicaid beneficiary may only recover the amount payable under Medicaid as his or her medical expenses in an action against a third party tortfeasor. (See Hanif[, supra,] 200 Cal.App.3d 635, 639-644 . . . [where the provider has relinquished any claim to additional reimbursement, a Medicaid beneficiary may only recover the amount payable under the state Medicaid plan as medical expenses in a tort *1353 action].) As a result, the tortfeasor escapes liability for the full amount of the medical expenses he or she wrongfully caused." (Id. at pp. 826-827.)
The court "urge[d] the Legislature to remedy this anomaly in a manner consistent with federal law." (Olszewski, supra, 30 Cal.4th at p. 827.) This exhortation suggests the court may not share Hanif's view of the measure of damages, regardless of its citation to the case. As noted above, provider reimbursement from a tort recovery is permissible under federal Medicaid law if (a) Medicaid is made whole before the provider recovers any money and (b) the assets of Medicaid beneficiaries are protected by limiting provider reimbursement to that portion of a tort recovery specifically allocated to the beneficiary's medical expenses. (Olszewski, at p. 822.) There is no suggestion the beneficiary must also be "liable" for the amounts recouped by the provider. Nor could there be such a requirement given the statutory mandate that Medicaid beneficiaries cannot be pursued for any amount above that paid by the government and any recoverable copayment. Thus, in advocating that providers be able to recover amounts exceeding Medicaid reimbursement from third party tortfeasors, the court seemed to be endorsing a measure of damages not dictated by the plaintiff's liability or the amount actually paid to and accepted by a provider as payment in full, but rather, reflecting the principle underlying the recovery of compensatory damages for gratuitously provided medical servicesthat compensatory damages also serve to place on the defendant the full economic consequence of his or her wrongful conduct.
The third case of interest is Parnell, supra, 35 Cal.4th 595. The plaintiff in Parnell was injured in an automobile accident and received treatment at a community hospital. (Id. at pp. 598-599.) He had health insurance through a work-related plan which paid the hospital at "preferred provider" rates, which the hospital, in turn, accepted as payment in full. (Ibid.) The plaintiff subsequently sued the driver of the vehicle that hit the taxicab in which he was riding, and the hospital filed a lien to recover the difference between the "actual" cost of the medical services it provided and the amount it received from the plan. (Ibid.) The plaintiff then sued the hospital, challenging its lien. (Id. at p. 600.) As noted above, the Supreme Court agreed the lien was invalid, concluding the HLA does "not give a hospital an independent cause of action against [a] third party tortfeasor" (35 Cal.4th at p. 603) and "a lien under the HLA requires the existence of an underlying debt owed by the patient to the hospital" (id. at p. 605).
The court reached this conclusion by examining the legislative history of the statute. "The HLA was originally enacted in 1961 to allow hospitals to recoup losses suffered when a patient `failed to discharge any portion of the hospital bill' even though that patient had `collected upon a cause of action *1354 against another.'" (Parnell, supra, 35 Cal.4th at pp. 603-604, quoting Pope, Enrolled Bill Rep. Mem. for Gov. Edmund Brown on Sen. Bill No. 1140 (1961 Reg. Sess.) July 17, 1961, p. 1, italics added.) "The Legislature was therefore concerned with uninsured patients who failed to pay any part of their debt to the hospital and enacted the HLA to give hospitals the ability to collect on this debt." (Parnell, at p. 604.) Because the hospital had accepted the amount paid by the plaintiff's insurer as payment in full, his "entire debt to the hospital ha[d] therefore been extinguished." (Id. at p. 609.) Because the plaintiff no longer owed a debt to the hospital for its services, the hospital could "not assert a lien under the HLA against [his] recovery from the third party tortfeasor." (Ibid.)
The court observed its holding might "result in a significant hardship" for hospitals, and it had "no doubt," as the hospital claimed, "`hospitals negotiate and enter into discounted rate agreements with the expectation that they will be entitled to recover additional funds from other payors who have an obligation to pay for the hospital's services.'" (Parnell, supra, 35 Cal.4th at p. 611.) The court, however, could only construe the statutes "in accordance with the Legislature's intent and the controlling case law." (Ibid.) As such, hospitals needed to look to the Legislature for a different outcome. (Ibid.) The court did not exhort the Legislature to take action to allow hospital liens on recoveries from third party tortfeasors for the difference between amounts billed and amounts accepted as payment in full, as it did in Olszewski. However, the court's suggestion hospitals could look to the Legislature in this regard, despite having accepted payment from a collateral source as payment in full, again indicates the court may take a more expansive view of the measure of damages than Hanif. Indeed, the court appears to have viewed the plaintiff as having been indebtedor liableto the hospital for the amount it initially billed, before applying all discounts, credits and payments (negotiated and made by the plaintiff's health care plan), which "extinguished" the plaintiff's "entire debt." (Parnell, at pp. 599, 609.) The court also suggested hospitals could, in any event, contractually "preserve their right to recover the difference between usual and customary charges and the negotiated rate through a lien under the HLA." (Id. at p. 611.)
The court concluded by noting that because its holding relied "solely on the absence of a debt underlying the lien," it did not reach and was expressing no opinion on several issues, including "whether Olszewski[, supra,] 30 Cal.4th 798 . . . and Hanif[, supra,] 200 Cal.App.3d 635 . . . apply outside the Medicaid context and limit a patient's tort recovery for medical expenses to the amount actually paid by the patient notwithstanding the collateral source rule . . . ." (Parnell, supra, 35 Cal.4th at p. 611, fn. 16.)
The fourth case of note is Prospect Medical Group, Inc. v. Northridge Emergency Medical Group (2009) 45 Cal.4th 497 [87 Cal.Rptr.3d 299, 198 *1355 P.3d 86] (Prospect). The issue in Prospect was whether providers of emergency medical services who do not have contracts with health maintenance organizations (HMO's) can bill HMO members for the difference between what they bill the HMO for their services and what the HMO paysin other words, whether emergency room providers can "balance bill" HMO patients. (Id. at pp. 503-504.) Given the statutory and regulatory controls on the delivery of emergency medical services and on the payments to providers by HMO's, the court held providers of emergency medical services who have direct recourse against HMO's cannot "balance bill" HMO members, but must resolve billing and payment disputes directly with the HMO's. (Id. at pp. 504-508.)
The court summarized the statutory and regulatory scheme as follows: Emergency room medical personnel are statutorily required to provide treatment necessary to stabilize a patient, without first inquiring into the patient's ability to pay. (Prospect, supra, 45 Cal.4th at pp. 504, 507.) Emergency patients are statutorily required either "to agree to pay for the services or to supply insurance information." (Id. at p. 507.) If emergency services are provided to an HMO member by an "out-of-network" provider, the HMO is statutorily required to pay for the services. (Id. at pp. 504, 507.) HMO's must have a dispute resolution mechanism accessible to noncontracting providers to resolve billing and payment disputes. (Id. at pp. 506-507.) In addition, some emergency services providers are statutorily entitled to sue HMO's directly over billing disputes. (Ibid.) "Interpreting the statutory scheme as a whole," the court concluded emergency services providers who have direct recourse against an HMO must resolve payment disputes directly with the HMO. (Id. at p. 507 & fn. 5.) The provider cannot involve the patient in the billing dispute and cannot "balance bill" the patient for any amount above that paid by the HMO. (Id. at p. 507.)
In the course of its analysis, the court made several significant comments about medical billing and payment. It stated several times emergency room doctors are "entitled to a reasonable payment for their services." (Prospect, supra, 45 Cal.4th at pp. 502, 509.) It also recognized, however, "[b]y the very nature of things" legitimate disputes can arise regarding "how much the emergency room doctors may charge and how much the HMO must pay for emergency services." (Id. at pp. 504-505.) Moreover, even though HMO's are required by regulation to pay the "`reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually,'" how this amount is determined "can create obvious difficulties." (Id. at p. 505.) "In a given case," stated the court, "a reasonable amount might be the bill the doctor submits, or the amount the HMO chooses to pay, or some amount in between." (Ibid.)
*1356 The court's holding in Prospect is also of interest with respect to the "liability" an HMO patient "incurs" for emergency services provided by a non-network provider. As the court explained, emergency medical personnel cannot condition treatment on ability to pay. An emergency patient is not required to agree to pay the provider's usual and customary charges, but can simply supply insurance information. And where the patient is covered by an HMO against which the provider has recourse, the HMO patient cannot be charged for any amount above that recovered by the provider from the HMO. An HMO patient's "liability" for emergency medical services provided by an out-of-network provider is thus limited by virtue of a comprehensive statutory and regulatory scheme to the amount paid to the provider by the HMOnot unlike a Medi-Cal beneficiary's "liability" for medical services is limited by a comprehensive statutory scheme to the amount paid to the provider by the government.

Clarifying the Measure of Damages
Having granted review in Howell v. Hamilton Meats & Provisions, Inc. (2009) 179 Cal.App.4th 686 [101 Cal.Rptr.3d 805], review granted March 10, 2010, S179115, the Supreme Court is poised to address the question identified but not reached in Parnellwhether Olszewski and Hanif "apply outside the Medicaid context and limit a patient's tort recovery for medical expenses to the amount actually paid by the patient notwithstanding the collateral source rule." (Parnell, supra, 35 Cal.4th at p. 611, fn. 16.) The threshold issue that needs clarification, however, is the measure of damages for past medical expenses.
As discussed above, in every context except that addressed in Hanif, the measure of damages has been articulated as the reasonable value of the medical services required because of the defendant's tortious conduct. Where the plaintiff has paid, or expressly incurred liability for, an amount exceeding the reasonable value of past medical services, recovery is limited to their reasonable value. Where the plaintiff is presumed to be liable for the reasonable value of such services, recovery is perforce for their reasonable value. And where the plaintiff receives gratuitously provided medical services, recovery may be had for their reasonable value. Whether this measure of damages, or the modified measure articulated in Hanif, applies where the plaintiff has paid, or incurred liability for, an amount ostensibly less than the reasonable value of the medical services, would seem to depend on which view of compensatory damages is given prioritythat focusing on reimbursing the plaintiff for actual economic loss, or that focusing on placing on the defendant the full economic consequence of his or her tortious conduct.
If priority is given to that aspect of compensatory damages focusing on reimbursing the plaintiff for actual economic loss, the measure of damages *1357 for past medical expenses must be as stated by Hanifthat is, the plaintiff is entitled to recover the lesser of the reasonable value of the medical services, or the amount he or she has paid, or incurred liability, therefor. As applied in Hanif, this measure resulted in a damages award for the amounts actually paid to the hospital and physicians by the government and which the government could recoup through assignment and lien rights. Putting aside the effect of the collateral source rule (which is necessary to analyze the threshold issue of the measure of damages), the plaintiff in Hanif thus recovered damages for the amount that would otherwise have passed through to the providers had they not been paid and because the providers were paid, would pass through to the payor. This result is consistent with the original rationale for allowing the recovery of damages for "incurred" medical expensesto enable the plaintiff to pay the provider. And in such case, there is no windfall recovery by the plaintiff.
Even under the measure of damages articulated in Hanif, however, damages awards will vary significantly, depending on how the courts define the plaintiff's "liability" for medical services. As subsequent cases, including this one, reflect, this determination can turn on a combination of sometimes highly complex factors, including who or what entity provided the medical services, who or what entity paid for them, statutory and regulatory controls on the providers and payors, and the contractual relationships between the providers, the plaintiff and payors. How courts come out on the "liability" issue will also reflect the divergent views of compensatory damages that have emerged in the case law, as well as the inherent tension between the two.
For example, in Hanif, the Court of Appeal concluded the minor plaintiff, a Medi-Cal beneficiary, was not "liable" for the amounts written off by the hospital and his physicians because state Medi-Cal and federal Medicaid statutes and regulations required the providers to accept government payment as payment in full and prohibited the providers from seeking additional amounts from the plaintiff. (Hanif, supra, 200 Cal.App.3d at pp. 639-640; see also Olszewski, supra, 30 Cal.4th at pp. 810-813, 817-820.) Arguably, a similar "liability" conclusion would follow under Prospect, as to an HMO member who received emergency services from an out-of-network provider. As discussed, the Supreme Court concluded in Prospect that the statutory and regulatory scheme governing emergency care providers and HMO's does not require the patient to agree to pay the provider's normal and customary charges, requires the provider to look to the HMO for payment, and prohibits the provider from seeking any additional amounts from the patient. (Prospect, supra, 45 Cal.4th at pp. 504-507.) This kind of "liability" analysis focuses on the actual dollars paid or owed (and required to be paid in the future) to the provider, thereby keeping the measure of damages focused on reimbursing the plaintiff for actual economic loss.
*1358 The court in Hanif did not indicate whether the plaintiff (or his parents) signed admission or intake paperwork agreeing to pay the providers' usual and customary charges. But if they did, did the plaintiff thereby "incur liability" for the providers' usual and customary chargesa "liability" which was subsequently discharged by a collateral source, i.e., the Medi-Cal program, through a combination of reduced rates and payment? Or, because the providers had previously agreed to participate in the Medi-Cal program, and thus obligated themselves to accept government payment as payment in full and to comply with statutory prohibitions against further recovery from beneficiaries, did that effectively vitiate any "liability" predicated on the providers' standard admission or intake paperwork? Similarly, where the plaintiff has private health care insurance and signs standard admission or intake paperwork agreeing to pay the provider's usual and customary charges, does he or she thereby "incur liability" for such chargesa "liability" that is subsequently discharged by the collateral source, i.e., the health care insurer, through a combination of reduced rates and payment? If the provider has entered into a preexisting contract with the insurer requiring the provider to accept payment at reduced rates as payment in full, does the plaintiff "incur" any real "liability" for the provider's usual and customary charges?
In Holmes v. California State Auto. Assn. (1982) 135 Cal.App.3d 635, 637-638 [185 Cal.Rptr. 521] (Holmes), the Court of Appeal took the view that by signing the hospital's standard admission paperwork, the plaintiff (a Medicare beneficiary) had "incurred" liability for the hospital's full charges. (Id. at p. 639 [plaintiff "at the time of her admission to the hospital expressly undertook personal liability for the expenses about to be incurred"].) The court held the plaintiff was thus entitled to recover that full amount under the medical payments clause of an automobile policy providing the insurer would" `pay all reasonable expenses incurred by the insured [as a result of an automobile accident].'" (Id. at p. 637.) The court rejected the insurance company's argument that the Medicare statutes and provider's preexisting agreement with the government had "the effect of precluding" the plaintiff from "incurring" any hospital expenses within the meaning of the policy. (Id. at pp. 637-639.)
While Holmes is a first party insurance case, it nevertheless illustrates the view that by signing standard admission and intake paperwork promising to pay, a patient (indeed, even a Medicare patient) "incurs liability" for a provider's usual and customary charges. (Holmes, supra, 135 Cal.App.3d at p. 639.) This is the analysis of "incurred liability" urged by plaintiff here. And, as noted in the majority opinion, it is also the view implicitly, if not expressly, taken by most other courts addressing damages and collateral source rule issues involving medical expense writeoffs. (Maj. opn., ante, at pp. 1324-1326.)
*1359 Using the Holmes analysis to pinpoint the plaintiff's "incurred liability" for past medical expenses, however, necessarily means that, in writeoff cases, the damages award will almost invariably exceed the actual dollar amount paid or owed to the provider (or subject to recoupment by the payor).[15] Accordingly, this analysis of "incurred liability" is at odds with the view of compensatory damages focusing on reimbursing the plaintiff for actual economic loss. It also is at odds with the original pass-through rationale for allowing the recovery of damages for "incurred" medical expensesto enable the plaintiff to pay providers what is owed and thus discharge his or her liability. And it inherently results in an economic windfall to the plaintiff. Moreover, this windfall not only consists of dollars for medical services that have not been, and never will be, paid for such services, but also dollars arising solely, and ironically, by virtue of tools intended to control escalating medical costsrate reductions and medical expense writeoffs.
The Holmes analysis is consistent, however, with the view of compensatory damages focusing on placing on the defendant the full economic consequences of his or her tortious conduct. Nevertheless, except in the context of gratuitously provided medical services (which appear to be a very small percentage of the medical services for which tort recovery is sought), the California courts have never expressly endorsed a measure of damages that results in the recovery of dollars, and potentially very significant dollars, for past medical expenses that will never be passed on to a provider to pay for medical services (or be subject to recoupment by a payor), but instead, will be retained by the plaintiff as an economic windfall. Indeed, in Helfend, where the Supreme Court reaffirmed California's adherence to the collateral source rule, the court suggested even those who gratuitously provide medical services reasonably expect repayment from a tort recoveryagain reflecting a pass-through rationale for the damages award, mitigating against an economic windfall. (Helfend, supra, 2 Cal.3d at p. 6, fn. 5; see also Kimball, supra, 159 Cal. at p. 231.)
If the view of compensatory damages focusing on placing on the defendant the full economic consequences of his or her tortious conduct is nonetheless given priority in this contextas the majority of courts appear to have donethere would seem to be no reason to engage in any excruciating analysis as to the "liability" the plaintiff "has incurred" for medical services. The measure of damages consistent with this view of compensatory damages is simply the reasonable value of the medical services required because of the defendant's tortious conduct, because that measure places at the defendant's door the full economic consequence of his or her wrongful conduct. And under that measure, the scope of the plaintiff's "incurred liability" for medical *1360 services is immaterialas evidenced by the recovery of damages for gratuitously provided medical services. (See, e.g., Rodriguez II, supra, 87 Cal.App.3d at p. 661; Gastine, supra, 65 Cal.App.2d at pp. 143-144.)
For years, the courts have charged juries with determining "[t]he reasonable value of medical . . . care, services and supplies reasonably required and actually given in the treatment of the plaintiff to the present time" (BAJI No. 14.10), or stated another way, the "reasonable cost of reasonably necessary medical care that [the plaintiff] has received" (CACI No. 3903A). Under such charge, juries have not been required to find, as a predicate determination, the extent of the plaintiff's "incurred liability." Rather, juries simply determine the "reasonable value" of past medical services based on the evidence presented at trial, and neither the provider's billed amount (reflecting usual and customary charges), nor the amount paid to the provider, definitively fixes the amount of recoverable damages. This approach remains fully apropos today, given the realities and complexities of health care billing and payment practices. While there is a constituency that believes amounts paid by health care plans do not reasonably compensate providers (see, e.g., Parnell, supra, 35 Cal.4th at p. 611), there is also a constituency that believes present day medical billing and payment practices have resulted in inflated charges that both anticipate a significant writeoff and ultimately insure payment that adequately compensates the provider. (See citations at fn. 1, ante.) As it has always been, determining the "reasonable value" of past medical services is a consummate task for the jury.
Applying a standard "reasonable value" measure of damages in medical expense writeoff cases will, of course, likely result in damages awards in line with the providers' initial billings, which may be for amounts significantly greater than the "reasonable value" of the services provided. (See citations at fn. 1, ante; see also Prospect, supra, 45 Cal.4th at p. 505.) But this result is not a consequence of the measure of damages. Rather, it is a consequence of the evidentiary aspect of the collateral source rule. As the majority opinion suggests (maj. opn., ante, at pp. 1330-1331), it is time to take a critical look at that rule, which generally bars evidence of amounts paid to providers.
In California, the evidentiary aspect of the collateral source rule is not an outright ban on such evidence, but leaves its admission to the sound discretion of the trial court. (Hrnjak, supra, 4 Cal.3d 725 at pp. 729-734.) The Supreme Court has expressed concern that "[e]ven with cautionary instructions, there is substantial danger that the jurors will take the evidence into account in assessing the damages . . . ." (Id. at p. 732.) Thus, "[a]dmission despite such ominous potential should be permitted only upon a persuasive showing that the evidence sought to be introduced is of substantial probative value." (Id. at p. 733.)
*1361 In the ensuing decades since these concerns were first voiced, however, the courts have exhibited a markedly heightened regard for the ability of juries to deal with complex and sophisticated legal and factual problems, including heeding limiting instructions in connection with otherwise highly prejudicial evidence. (See, e.g., People v. Kelly (2007) 42 Cal.4th 763, 782-787 [68 Cal.Rptr.3d 531, 171 P.3d 548] [evidence of prior improper financial dealings with other women, of prior assault on a woman, and of rapes of three other women admitted in capital rape/murder case for limited purposes of showing identity, common plan or design and intent]; People v. Roldan (2005) 35 Cal.4th 646, 704-707 [27 Cal.Rptr.3d 360, 110 P.3d 289] [evidence of prior robbery admitted in capital robbery/murder case for limited purposes of showing identity, motive and intent]; Piscitelli v. Salesian Society (2008) 166 Cal.App.4th 1, 7-13 [82 Cal.Rptr.2d 139] [evidence of cleric's prior felony sexual abuse conviction admitted in civil action against priesthood for failure to protect plaintiff against sexually predatory priest for limited purposes of impeaching witness and to show bias]; Rufo v. Simpson (2001) 86 Cal.App.4th 573, 597-599 & fn. 6 [103 Cal.Rptr.2d 492] [evidence of Nicole Brown Simpson's telephone calls to battered women's shelter, diary entries and letter referring to prior incidents of domestic violence admitted in civil wrongful death and survival action for limited purpose of showing Nicole's state of mind about her relationship with O.J. Simpson].)[16]
If properly instructed juries can handle this kind of potentially prejudicial evidence in very seriouseven life and deathcases, surely juries can consider, with proper instruction, evidence of amounts paid to health care providers on the issue of the "reasonable value" of health care services. (Cf. Gersick v. Shilling (1950) 97 Cal.App.2d 641, 649-650 [218 P.2d 583] [error in admitting evidence of payments by plaintiff's medical insurer and of disability benefits "cured" by instruction that plaintiff was entitled to recover damages for all expenses incurred and the amount of damages should not be reduced by the receipt of payments from sources wholly independent of the wrongdoer].)
The ensuing decades have also brought us the medical billing and payment practices that now make evidence of what providers are paid highly relevant on the issue of the "reasonable value" of medical services. The Supreme Court recognized as much in Prospect when it stated: "In a given case, a reasonable amount might be the bill the doctor submits, or the amount the HMO chooses to pay, or some amount in between." (Prospect, supra, 45 Cal.4th at p. 505; see also citations at fn. 1, ante.) Thus, it seems beyond cavil that such evidence "is of substantial probative value." (See Hrnjak, supra, 4 Cal.3d at p. 733.)
*1362 It is time therefore to trust juries to heed limiting instructions in this context, as in others, and to let juries hear all the relevant evidence on the "reasonable value" of medical services.[17]
NOTES
[1] Greer held that evidence of the full amount of a plaintiff's billed medical expenses was admissible in a personal injury action to show the reasonable cost of medical care, even if such expenses were not ultimately recoverable to the extent they exceeded the amount actually paid by plaintiff or his insurer. (Greer, supra, 141 Cal.App.4th at pp. 1156-1157.)
[2] SOMA challenged the fees for four of Yanez's five expert witnesses. The four fees challenged totaled $5,992.50.
[3] In Parnell v. Adventist Health System/West (2005) 35 Cal.4th 595 [26 Cal.Rptr.3d 569, 109 P.3d 69], the California Supreme Court upheld Nishihama's holding that the HLA limits providers to recovery of their actual charges, but it specifically declined to decide whether Hanif applied outside of the Medi-Cal context to limit a patient's recovery to the amount actually paid. (Parnell, at pp. 611-612, fn. 16.)
[4] Civil Code section 3281 states: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."
[5] Civil Code section 3282 states: "Detriment is a loss or harm suffered in person or property."
[6] Civil Code section 3333 states: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."
[7] Civil Code section 1431.2, subdivision (b)(1) states in relevant part: "For purposes of this section, the term `economic damages' means objectively verifiable monetary losses including medical expenses . . . ."
[8] Comment h states in relevant part: "When the plaintiff seeks to recover for expenditures made or liability incurred to third persons for services rendered, normally the amount recovered is the reasonable value of the services rather than the amount paid or charged. If, however, the injured person paid less than the exchange rate, he can recover no more than the amount paid, except when the low rate was intended as a gift to him. . . ." (Rest.2d Torts, § 911, com. h, pp. 476-477.)
[9] Howell v. Hamilton Meats & Provisions, Inc. (2009) 179 Cal.App.4th 686 [101 Cal.Rptr.3d 805], review granted March 10, 2010, S179115.
[10] Decisions adopting the majority view include the following: Wills, supra, 892 N.E.2d 1018, 1025-1029; White v. Jubitz Corp. (2009) 347 Ore. 212 [219 P.3d 566, 583]; Papke v. Harbert (2007) 2007 SD 87 [738 N.W.2d 510]; Lopez, supra, 129 P.3d 487, 495; Pipkins v. TA Operating Corp. (D.N.M. 2006) 466 F.Supp.2d 1255, 1259-1262; Lindholm v. Hassan (D.S.D. 2005) 369 F.Supp.2d 1104, 1110-1112; Mitchell v. Haldar (Del. 2005) 883 A.2d 32, 40; Olariu v. Marrero (2001) 248 Ga.App. 824 [549 S.E.2d 121, 123]; Bynum v. Magno (2004) 106 Haw. 81 [101 P.3d 1149, 1160-1162]; Arthur v. Catour (2004) 345 Ill.App.3d 804 [281 Ill.Dec. 243, 803 N.E.2d 647, 650]; Bozeman v. State (La. 2004) 879 So.2d 692, 705-706 (Bozeman); Hardi v. Mezzanotte (D.C.Cir. 2003) 818 A.2d 974, 985; Rose v. Via Christi Health System, Inc. (2003) 276 Kan. 539 [78 P.3d 798] (Rose); Wal-Mart Stores, Inc. v. Frierson (Miss. 2002) 818 So.2d 1135, 1139-1140; Haselden v. Davis (2003) 353 S.C. 481 [579 S.E.2d 293, 294]; Koffman v. Leichtfuss (2001) 2001 WI 111 [246 Wis.2d 31, 630 N.W.2d 201, 207-210]; Acuar v. Letourneau (2000) 260 Va. 180 [531 S.E.2d 316] (Acuar); Brown v. Van Noy (Mo.Ct.App. 1994) 879 S.W.2d 667, 676.
[11] In addition to Hanif and Nishihama, cases that have been cited for the minority view include Moorhead v. Crozer Chester Medical Center (2001) 564 Pa. 156 [765 A.2d 786] (Moorhead) (Medicare payment), disapproved on another point in Northbrook Life Ins. Co. v. Commonwealth (2008) 597 Pa. 18 [949 A.2d 333, 337]; Cooperative Leasing, Inc. v. Johnson (Fla.Ct.App. 2004) 872 So.2d 956, 958-960 (Medicare payment); and Bates v. Hogg (1996) 22 Kan.App.2d 702 [921 P.2d 249, 252-253] (Medicaid payment). Cooperative Leasing applied a Florida statute providing, "benefits received under Medicare . . . shall not be considered a collateral source." (872 So.2d at pp. 959-960, quoting Fla. Stat., § 768.76.) The Kansas Supreme Court has limited Bates v. Hogg to the Medicaid context. (Rose, supra, 78 P.3d at p. 803.)
[12] To the extent Hanif relies on the term "medical expenses" in Civil Code section 1431.2, subdivision (b)(1), we note that this statute does not define "expenses" or even limit a plaintiff's recoverable monetary losses for medical care to "medical expenses." It defines economic damages to include any "objectively verifiable monetary loss" resulting from the plaintiff's injury, whether classifiable as an "expense" or not.
[13] If Yanez's insurance included any annual or lifetime caps on the insurers' coverage liability, the discounts also benefitted her by increasing the amount of covered medical services she could obtain before exhausting her coverage.
[1] (See, e.g., Ireland, The Concept of Reasonable Value in Recovery of Medical Expenses in Personal Injury Torts (Mar. 2008) 14 J.Legal Econ. 87, 90 ["Prices in American medicine often have little relationship to any notion of what is reasonable or what might be the prices in a competitive market. Given . . . the choice between $500,000 billed by medical care providers and the $100,000 paid by third party payers in my example, it is likely that $100,000 is closer to whatever proxy for `reasonable value' or `competitive equivalent' that we might come up with."]; Curtis, The reasonable value of medical services: A hospital bill, the insurer's payment, or the jury's choice? (Spring 2008) 23 Me. B.J. 78, 78-79 [because of complexity of billing and payment practices, neither amount billed, nor amount paid, may be representative of "reasonable value" of medical services]; Gleissner, Proving Medical Expenses: Time for a Change (Spring 2005) 28 Am. J. Trial Advoc. 649, 650-657 ["Frequently, the difference between the stated charge and the reimbursement rate actually paid is extremely significant. It is therefore increasingly difficult to know what the true charges will be after they are reduced by the different reimbursement methodologies, schedules, computer programs, agreements, audits, regulations, adjustments, and pre-determined reimbursement rates. . . . [¶] . . . [¶] . . . Presenting [billed] charges to the jury is arguably against public policy because they represent illusory or illegal charges."]; Middleton, Hospitals Are Just Playing the Medicare Game (Dec. 2002) Vol. 1, No. 12, health policy prescriptions [as of June 24, 2010] ["Akin to the manufacturer's suggested retail price on automobiles, hospital retail charges are inflated prices that don't reflect what they are actually paid. In fact, the differential is even greater for hospitals than for automobiles. Medicare and private insurers pay only a fraction of hospital charges."]; Jones, Managed Care and the Tort System: Are We Paying Unnecessary Billions? (Jan. 1, 1996) 63 Def. Couns. J. 74, 75 ["[R]esearch discloses that, depending on the geographical area, as many as 80 percent of providers are estimated to be rendering health care under managed plans of one type or another" and "[a]t least half of all health care in the United States now is provided under some type of managed care plan. [¶] . . . [¶] . . . The difference between the managed care fixed rate and the provider's billed charges is often as much as 600 to 800 percent."].)
[2] Civil Code former section 36 provided in pertinent part that a minor could not disaffirm an otherwise valid contract "to pay the reasonable value of things necessary for his support." (Civ. Code, former § 36 [stats. 1927, ch. 876, § 1, p. 1917].)

All further statutory references are to the Civil Code unless otherwise indicated.
[3] Bauman v. San Francisco, supra, 42 Cal.App.2d 144, was superseded by statute on another ground as stated in Bonanno v. Central Contra Costa Transit Authority (2003) 30 Cal.4th 139, 150, footnote 3 [132 Cal.Rptr.2d 341, 65 P.3d 807].
[4] In Goodall v. Brite (1936) 11 Cal.App.2d 540 [54 P.3d 510], the Court of Appeal reviewed an injunction prohibiting a county hospital from providing services to certain individuals. The court affirmed the injunction as to individuals who could, themselves or through legally responsible relatives, pay for services at a private medical facility on the ground providing services at county expense constituted an unlawful gift of public funds. (Id. at pp. 543-548.) The court reached a contrary conclusion as to individuals who could, themselves or through legally responsible relatives, only partially pay for such services and as to individuals facing a life threatening injury or illness and needing immediate medical care. (Id. at pp. 548-552.) As to the latter two groups of individuals, the county was entitled to charge for medical services according to their ability to pay "to lighten the taxpayers' burden as much as possible." (Id. at p. 551.)
[5] Government Code section 23004.1 now "gives a county a first lien for the cost of medical care it has provided to an injured person against any judgment that person recovers from a third person who is responsible for the injury." (City and County of San Francisco v. Sweet (1995) 12 Cal.4th 105, 108, 124 [48 Cal.Rptr.2d 42, 906 P.2d 1196].)
[6] See footnote 1 discussing the debate over whether the amounts billed by providers, the amounts paid thereto, or some amount in between, most closely reflects the "reasonable value" of medical services.
[7] This also is the view of the majority of jurisdictions that still recognize the collateral source rule. (See, e.g., Wills v. Foster (2008) 229 Ill.2d 393, 407-419 [323 Ill.Dec. 26, 892 N.E.2d 1018, 1027-1031]; Bynum v. Magno (2004) 106 Haw. 81, 88-89 [101 P.3d 1149, 1156-1157].)
[8] The Hanif court explained its conclusion that the Medi-Cal payments were a collateral benefit as follows: "For purposes of analysis, [Hanif] is deemed to have personally paid or incurred liability for these services and is entitled to recompense accordingly. This is not unreasonable or unfair in light of Medi-Cal's subrogation and judgment lien rights [citations]." (Hanif, supra, 200 Cal.App.3d at p. 640.) However, that a plaintiff must have paid or incurred liability for medical services is not a requirement for the collateral source rule the Supreme Court has ever identified. (See Hrnjak v. Graymar, Inc. (1971) 4 Cal.3d 725, 729-730 [94 Cal.Rptr. 623, 484 P.2d 599] (Hrnjak); Helfend, supra, 2 Cal.3d at pp. 9-13.) If it were, the collateral source rule could not apply to gratuitously provided services. However, California courts have long recognized the collateral source rule applies in such cases. (See Anheuser-Busch, Inc. v. Starley, supra, 28 Cal.2d at p. 349 [collateral source rule "has been applied where the independent source is pension systems or charity"].) In Arambula v. Wells (1999) 72 Cal.App.4th 1006, 1011-1015 [85 Cal.Rptr.2d 584], the Court of Appeal held the fact the plaintiff had no obligation to repay wages his employer continued to pay during his convalescence did not preclude application of the collateral source rule. As the court observed, whether a plaintiff has paid for a collateral benefit, or is liable to his or her benefactor, has never been a requirement of the rule. (Id. at pp. 1011-1014.)
[9] Section 3281 states: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."
[10] Section 3282 states: "Detriment is a loss or harm suffered in person or property."
[11] Section 3333 states: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."
[12] The statute defines "economic damages" for "purposes of this section" to mean "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities." (§ 1431.2, subd. (b)(1).)
[13] Section 3359 provides: "Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered."
[14] More than 10 years after section 3333.1 was added to the Civil Code as part of MICRA (Stats. 1975, § 24.5, ch. 1, p. 1), the Legislature added section 985 to the Government Code as part of "public entity tort reform legislation" (Stats. 1987, § 25, ch. 1201, pp. 4269, 4286). (Garcia v. County of Sacramento (2002) 103 Cal.App.4th 67, 74 [126 Cal.Rptr.2d 465].) One of the articulated purposes of the latter statute is to "`limit double-recovery of damages, providing for a portion of the award to go to the source of those [collateral] benefits or to be reduced from the judgment.'" (Ibid., quoting letter from Attorney General (Van de Kamp) urging Governor (Deukmejian) to sign the legislation.) Unlike Civil Code section 3333.1, Government Code section 985 bars evidence of collateral source benefits but expressly allows for the postverdict deduction of collateral benefits and in some circumstances requires it, unless the trial court determines any deduction would result in undue financial hardship to the plaintiff. (Garcia v. County of Sacramento, at pp. 72-73; see also Scott v. County of Los Angeles (1994) 27 Cal.App.4th 125, 154-155 [32 Cal.Rptr.2d 643].)
[15] In every case, a plaintiff's recovery is constrained to the "reasonable value" of the medical services. (See cases cited at pp. 1333-1335, ante.)
[16] People v. Roldan, supra, 35 Cal.4th 646, was overruled, on another ground, as stated in People v. Doolin (2009) 45 Cal.4th 390, 421, footnote 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].
[17] Presenting all the relevant evidence on the reasonable value of medical services may add to the length of trial proceedings. But it has never been a tenet of our law that speed in disposition should be secured through a selective and inherently biased presentation of the evidence. Rather, we place paramount interest in solidly grounded verdicts, returned by fully informed and deliberative jurors.